## TEN–CATE v. FIRST NAT. BANK OF DECATUR.
### No. 12686.

Court of Civil Appeals of Texas. Fort Worth.

May 23, 1932.

Ernest May and Virgil M. Blow, both of Fort Worth, for appellant.

C. T. Gettys, of Decatur, for appellee.

CONNER, C. J.

This is an appeal from a judgment in favor of the defendant in a suit instituted by the appellant upon an advertising contract which, by the terms of one of its paragraphs, obligated the defendant bank to pay $624 for the material to be furnished by the plaintiff in the prosecution of an advertising scheme.

The suit was defended on the ground that the contract so providing had been fraudulently procured by the plaintiff's agent who had conducted the negotiations.

As the case is presented to us, it is determinable from the evidence which appears before us in a duly authenticated statement of facts.

Briefly stated, the evidence discloses that one G. L. Gower, plaintiff's agent and representative, appeared before the officers of the appellee bank, stating that the plaintiff was in the business of furnishing advertising specialties and conducting advertising campaigns on behalf of banks for new business, and proposed to enter into a contract to furnish such specialties and a mailing list containing names of prospective customers to whom appellee should mail the advertising matter which was to be supplied by plaintiff in envelopes already addressed, so that appellee would only be out the postage to be placed thereon together with the cost of inserting any of the advertising matter in newspapers; that plaintiff's compensation would be only 10 per cent. of the profits that should be derived by appellee from the new business that should be found to be directly traceable to plaintiff's efforts in such matter; and that appellee had everything to gain and nothing to lose by entering into such a contract, except possibly the postage it might use in mailing out the advertising matter, and that plaintiff was thus taking all the chances.

The subject was taken up and discussed by the agent and J. A. Simmons, vice president of the bank, E. P. Gibson, cashier, and E. H. Baumgartner, a director. The agent exhibited the printed form of the contract, which was in two sheets; each being of the same size, form, and color, and each designated as "Original Order No. 1733." The first sheet, as we shall designate it, contained the following paragraphs:

"The above mentioned service and material you are hereby authorized to furnish us for a period of eighteen months beginning May 15, 1929, or as soon thereafter as possible.

"As compensation for the use of your ideas and service we agree to pay you ten per cent. (10%) of the net profits directly traceable to your work during the period of the agreement.

"We to deduct the expense of printing material ordered by us and entering into the work, the amount not to exceed $624.00 as well as all other expenses coincident to carrying out the program, and pay you 10% of the remaining net balance thirty days from date of expiration of service, after results have been figured by us.

"It is understood and agreed that we are to be sole judge and that you are to accept our figures based on 10% profit on our increased new business secured through your services and co-operation, and this is to be the basis for the final settlement of the account.    •

"All provisions of this order are contained herein and it is hereby agreed and understood that it cannot be countermanded or cancelled and that there is no verbal contract, agreement or understanding of any kind other than stated in this order."

The second sheet contained the following paragraphs:

"This material is to be furnished us to cover a period of eighteen months, beginning May 15, 1929, or as soon thereafter as possible and shipped to us by freight or express at our expense. We agree to pay for the above material the sum of $624.00 in full settlement on regular printing terms, which are within fifteen days from date of shipment less one per cent. discount or net by the twentieth of the month following. In consideration of the special price for which this material is furnished us through your sources, and because of your willingness to take care of this work for us—to insure prompt payment, we authorize you to draw on us for the total amount of this order in the event that bill is not paid within ten days from the date due.

"You are authorized to immediately start production of the material ordered that in consideration of your acceptance of this order, recognizing the necessary production costs involving advanced cash expenditure by you, it is hereby agreed and understood that all provisions of this order are contained herein and that there is no verbal contract or understanding of any kind with our representative whereby the above written terms hereof can be changed, varied or modified in any manner."

Both sheets were duly signed by Vice President Simmons. His evidence, briefly stated, was to the effect that, after a preliminary discussion, he, together with the cashier, went to the office of Mr. Baum-

gartner, the director, and that the agent, Gower, began telling how much their plan would increase the deposits of the bank, stating that that had been the result at other places and that they (the plaintiffs) took all the chances and had confidence enough in the plan to believe it would go over, and said that "we had all to gain and nothing to lose other than some ·postage· and he. discussed the advertising in the little paper here"; that "about that time I was called out"; that while he was there nothing was said about the company selling the bank any material to be used by the bank; that he remained in the room of the director but a few moments when he was called out; that later Mr. Gibson, Mr. Baumgartner, and Mr. Gower came to his desk in the bank, and Mr. Baumgartner said:

"We have gone into this matter with this man and he has read his contract to us, and it looks as if we had all to gain and nothing to lose and are ready for you to sign this contract. * * * I stated that I didn't have time to read the contract. Mr. Baumgartner and Mr. Gibson both stated the contract had been read to them and to go ahead, that we couldn't lose anything, besides all the advertising we already had anyway. * * * Mr. Gower said if we (the bank) didn't get the business, they didn't get anything out of it.

"Q. Was anything said there about selling any material, or purchasing any for you, or expect you to pay for any of the material? A. No.

"Q. Did he say anything about having a separate contract for the material? A. No.

"Q. Did you understand at any time there was to be a separate contract for the material? A. No.

"Q. Did you sign the contract then? A. Yes.

"Q. Or did you understand that you were signing one or two contracts, or how many contracts did you understand you were signing? A. I supposed the one contract.

"Q. Had there been anything said about two contracts? A. Not to me, I just signed what they seemed to have filled out in Mr. Baumgartner's room and brought up to my desk.

"Q. Would you have signed it but for the fact it was stated there the contract had been read to Mr. Baumgartner and Mr. Gibson? A. No.

"Q. You signed it then with the understanding it had been read to them? A. Yes.

"Q. If you had known there were two contracts there, one for material and one for the service, would you have signed the contract for materials, such as is sued on? A. No.

"Q. The statement you heard him make with reference to the contract being such the bank had everything to gain and nothing to lose, except postage and what might be for newspaper advertising, did you rely on what he said in that respect? A. Yes."

E. H. Baumgartner stated, among other things, in substance:

That he was one of the directors of the defendant bank, and was present when the matter of making the contract for publicity services was taken up; that Mr. Gibson and Mr. Simmons and Mr. Gower came into his office, and Mr. Gower "went over with us this advertising proposition. It was to increase our business and we were to pay him at the end of eighteen months.

"Q. How much were you to pay? A. Ten per cent. of the profits of the increased business. We were not to be out anything except the advertising and postage on letters. They were to be sent to us already addressed and we were to pay for the postage for mailing them out. * * *

"Q. Was it understood about selling you some stationery to be used in that service? A. Nothing at all. They were to furnish everything and we were to be out this advertising.

"Q. Was anything said about your being expected to pay for material to go into that service? A. No.

"Q. Now did he have a contract there he purported to read? A. Yes, he said the contract was—either Mr. Gibson was busy or Mr. Simmons was away, and he read it to him.

"Q. Did he purport to read it? A. Yes.

"Q. Did he purport to read the entire contract there? A. I suppose so; he didn't say anything about this $624.00. That wasn't mentioned at all; in the contract, I mean, he didn't read it.

"Q. The contract he sues on contains this provision: 'This material is to be furnished us for eighteen months beginning May 15, 1929, or as soon as possible thereafter by shipment to us by freight, or express, at our expense.' Did he read that? A. No.

"Q. 'And further, we agree to pay $624.00 in full settlement of regular printing terms, which are made fifteen days from date of shipment.' Did he read that? A. He didn't read any such provision as that.

"Q. And the further provision: 'in consideration of the special price which this material is furnished, we authorize you to draw on us for the total amount of this order in the event the bill is not paid within ten days beyond the date due.' Did he read that? A. No.

"Q. Did he discuss any provision of that character as being a part of it? A. No.

"Q. And 'further, you are authorized to deduct the expenses of this order,' and so on. Did he read that provision, or anything like it? A. No.

"Q. Did he discuss with you the fact there was to be in the contract any provision of that kind? A. No.

"Q. Did he make mention of any payment to be made by you other than ten per cent. of the net profits due to their activities? A. None, except this advertising and the postage on those letters; they were to be sent to us to mail out.

"Q. Was anything said about if the venture failed to succeed whether or not the bank would be charged anything? A. Nothing at all.

"Q. Was anything said about who would take the chances or the losses? A. We had everything to gain and nothing to lose. Mr. Gibson remarked he didn't believe it could be done and he said they had done it at other places and they would take the chance. * * *

"Q. Now when you got through with that conversation, did you go with Mr. Gibson up to Mr. Simmons desk? A. Yes.

"Q. What happened up there? A. Well, I told Mr. Simmons we thought he had a good thing; that we had everything to gain and nothing to lose; and he said he didn't have time to read the contract, or something to that effect, and he signed the contract.

"Q. Did he sign it without reading it? A. Yes.

"Q. Was he busy there? A. Yes, he was busy.

"Q. With other matters? A. Yes.

"Q. What did Mr. Gower say up there? A. Well, I don't remember now, except we had all to gain and nothing to lose."

We will not quote the testimony of Mr. Gibson, the cashier, but think it sufficient to say that it was in substance and probative force in harmony with that of Mr. Simmons and Mr. Baumgartner.

While appellant's agent, Gower, testified by deposition that Simmons, the vice president, in fact read the contracts in question and there are a few other circumstances relied upon as supporting appellant's contention, we nevertheless think it manifest that the evidence, construed favorably in behalf of appellee, supports the trial court's finding and judgment to the effect that the obligation declared upon was procured by fraud and deception. Fraud is deducible from artifice and concealment as well as from affirmative conduct of a character to deceive.

In 25 Corpus Juris, p. 1066, under title of "Fraud," it is said:

"If the act of deception is accomplished the form of deceit is immaterial. In its generic sense a false representation is anything short of a warrant which produces upon the mind a false impression conducive to action. * * * The plainest case of false represen-

tation is the telling of a deliberate and intentional lie. * * * But a representation need not be a direct lie in order to constitute remedial fraud; the false representation may consist in a deceptive answer, or any other indirect but misleading language. * * *

"Falsehood may be acted as well as spoken. Deceptive conduct is equivalent to a verbal misrepresentation. Misrepresentation by conduct may consist in the declaration or payment of a fictitious dividend, the delivery under contract or an article different from the one bargained for, * * * pointing out subject matter different from that involved, * * * or other acts calculated to deceive. The misrepresentation need not inhere only in conduct but may consist of a combination of conduct and concealment, or conduct and language."

We see nothing in the evidence sufficient to justify the conclusion that the officers of the bank were required to distrust the good faith of appellant's agent or to cause a well-founded suspicion that he was intending to deceive. It is true the officers of the bank, had they so insisted, could undoubtedly have read the written instruments, but the preliminary conversations were such as to cause the belief that they were as represented, and, when the agent at his own suggestion read them, it was his undoubted duty to have read all of the clauses. To read but a part of that which was in harmony with his verbal statements that the bank was to be without cost for services or material and to purposely omit the paragraphs and clauses now relied upon as imposing a liability can be construed as nothing less than a fraud.

In Western Mfg. Co. v. Cotton, 126 Ky. 749, 104 S. W. 758, 12 L. R. A. (N. S.) 427, it is stated in the syllabus: "Where a person by ostensibly reading a contract to another obtains his signature to an agreement materially different from the reading, it is a fraud which invalidates the contract."

In the opinion it is said: "In this case it is not disputed in the evidence that appellee Cotton did sign the contract without reading it. His testimony that he did sign it without reading is uncontradicted. It is not material whether the contract was misread to appellee, or whether, contrary to the agreement reached by the parties, it was written differently by appellant's salesman and appellee's signature obtained without his attention being called to the alteration. The act of obtaining his signature to it under either state of case was a fraud upon appellees, and ought not in justice to stand."

In Texas Jurisprudence, vol. 10, p. 99, it is said: "Where one party, by false statements, induces the other to sign the contract without reading it, it does not lie in his mouth to say that his opponent was negligent in that he had the means of learning the truth, and

should have done so—the instrument may be avoided."

In the case of I. & G. N. Ry. Co. v. Harris, 65 S. W. 885, by the San Antonio Court of Civil Appeals, writ of error denied, it appears that an injured employee had been sent by the company to a hospital for treatment, and while there the employee was asked by the hospital clerk to sign his discharge from the hospital. The body of the instrument was covered by another paper, and, though the employee could read, he signed the paper without reading it, and the same proved to be a release of his claim for damages against the defendant. It was held that this evidence was sufficient to have warranted the submission to the jury of the issue of fraud in the procurement of the release, and was also sufficient to sustain a finding to that effect.

It follows that the contract having been fraudulently procured, no effect can be given, as is insisted, to that clause in the written contract which declares that "there is no verbal contract, agreement or understanding of any kind other than stated in this order." It is true that the principal may have acted in good faith upon receipt of the written contract, and in proceeding to prepare and furnish the material indicated by its terms, but it is undisputed that the agent had the authority to procure the contract that was executed by the bank, and his principal cannot be relieved of the consequences of his fraud on the ground that the principal was without knowledge thereof. As said in Henderson v. San Antonio & M. G. Ry. Co., 17 Tex. 560, 67 Am. Dec. 675, "Nothing is better settled, than that the fraud of an authorized agent will invalidate a contract, entered into by him, on behalf of his principal, although in perpetrating the fraud, the agent acted without the knowledge or consent of the principal."

And in the next syllabus it is said: "And even though the agent has transcended his authority in making the contract, yet if the principal ratify it and make the contract his own by availing himself of the benefits of it, he is liable in like manner as if he had personally made the contract."

See, also, Wright v. Calhoun, 19 Tex. 420.

In 22 Corpus Juris, pages 1215–1217, it is said: "It is well established that fraud vitiates everything which it touches. Parol evidence is always admissible to show, for the purpose of invalidating a written instrument, that its execution was procured by fraud, or that, by reason of fraud, it does not express the true intention of the parties. The rule in this respect is not rendered inapplicable by the fact that the writing contains a recital to the effect that all agreements between the parties are contained therein, or a provision that no verbal agreements affecting its validity will be recognized."

See, also, Thompson Co. v. Sawyers, 111 Tex. 374, 234 S. W. 873, 874, by our Supreme Court, in which it is said: "One who is entitled to avoid an entire written contract because it lacked his assent can no longer be held bound by any of its stipulations, including those relating to representations or guaranties which induced its execution," citing numerous cases.

Nor do we find any sufficient support in the evidence for upholding appellant's plea of estoppel. There is evidence to the effect that the agent only left with the bank officers the sheet of the contract that harmonizes with the agent's oral representations, the other sheet, to wit, the one containing the agreement to pay for the material, seems not to have been in any way called to the attention of the bank officers, and they, immediately upon notification by the appellant that the material had been prepared and shipped and request made for remittance of $624, notified appellant that they had made no agreement for such payment, referring appellant to the terms of the contract that had been left with them, and declared that the material would be held subject to the disposition of appellant.

Without further discussion, we conclude that all assignments of error must be overruled, and the judgment below affirmed.