Waylon E. CAMPBELL, et ux.,
Appellants,

v.

Don L. BOOTH et ux., Appellees.

No. 18592.

Court of Civil Appeals of Texas,
Dallas.

June 27, 1975.

Rehearing Denied Aug. 7, 1975.

**168** ■

John M. Gillis, Gillis, Rogers & Taylor, Dallas, for appellants.

Don C. Templin, Haynes & Boone, Dallas, for appellees.

CLAUDE WILLIAMS, Chief Justice.

Waylon E. Campbell and Margaret J. Campbell brought this action against Don L. Booth and Janet B. Booth for damages, both actual and exemplary, alleged to have resulted from affirmative fraudulent concealment in the sale of real estate. The Booths were the owners of a house located in Dallas, Texas, and entered into a contract with the Campbells during the month of August 1973, whereby the Campbells agreed to purchase the house for a stated consideration. In their petition the Campbells alleged that prior to the sale, the Booths had failed to disclose to them that the carpet throughout the house had been permeated with canine urine and that the Booths had actively concealed from the Campbells the extensive deleterious effects of said urine; that said facts were material to the transaction; that the Campbells had relied and acted on the presumption that no such fact existed and that they did not become aware of the malodorous nature and condition of the carpet throughout the house until after they obtained possession. They alleged damages caused by replacement of the carpet throughout the house which caused a depreciation of the value of the premises. Trial was to a jury, and at the close of plaintiff's evidence, defendants moved for and were granted an instructed verdict. Judgment was rendered that plaintiffs take nothing. This appeal involves the sole question of the propriety of the action on the part of the trial court in granting the motion for directed verdict.

■ Our appellate review of a judgment based upon a directed verdict is governed by well-established rules of law. A directed verdict presents a "no evidence" point. *Shubert v. Fidelity & Casualty Co.,* 467 S.W.2d 662, 663 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref'd n. r. e.). We are required to accept as true the evidence in the record supporting appellants' allegations, both of fraud and damages disregarding all evidence to the contrary. All conflicts and inconsistencies must be resolved in favor of appellants, and we must draw all inferences therefrom most favorable to appellants' alleged cause of action. *Constant v. Howe,* 436 S.W.2d 115 (Tex.1968); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965); *Adams v. Slattery,* 156 Tex. 433, 295 S.W.2d 859, 865 (1956); *Triangle Motors v. Richmond,* 152 Tex. 354, 258

S.W.2d 60 (1953); *Anderson v. Moore*, 448 S.W.2d 105 (Tex.1969). If the evidence presented is of such a conclusive character that reasonable minds could not differ as to its effect and only one conclusion may reasonably be drawn from it, only then does the question become one of law, thereby justifying the granting of an instructed verdict. *Clevenger v. Liberty Mutual Insurance Co.*, 396 S.W.2d 174, 177 (Tex.Civ. App.—Dallas 1965, writ ref'd n. r. e.). The appellate court does not pass upon the credibility of witnesses but is obligated to accept as true all evidence which, when liberally construed in favor of the adverse party, tends to support such adverse party's contention and disregards all contradictory evidence favorable to the movant. When so viewed, if the evidence amounts to more than a mere suspicion or speculation that the fact propositions asserted by the opponent to the motion might be true or false, an issue of fact is raised and should be submitted to the jury. *Humphreys v. Haragan*, 476 S.W.2d 880, 882 (Tex.Civ.App.— Amarillo 1972, no writ); 3 McDonald, Texas Civil Practice § 11.28.2, at 235–36 (1970).

In determining issues of fraud courts allow a wide latitude, and the evidence thereon may embrace all the facts and circumstances which go to make up the transaction, disclose its true character, explain the acts of the parties, or throw light on their objects and intentions. The presence or absence of a certain state of mind may be proved by circumstances. Fraud is deducible from artifice and concealment as well as from affirmative conduct of a character to deceive. *Blanton v. Sherman Compress Co.*, 256 S.W.2d 884 (Tex.Civ.App.— Dallas 1953, no writ); *Ten-Cate v. First National Bank*, 52 S.W.2d 323, 326 (Tex.Civ. App.—Fort Worth 1932, no writ).

We have examined the record in the light of these rules. Mr. and Mrs. Booth, the owners of the property in question, placed the property in the hands of a real estate broker to negotiate a sale. Mr. and Mrs. Campbell, on one or more occasions, inspected the house. During these inspection tours, made in company with the real estate agent, the Campbells did not observe anything out of the ordinary nor did they smell any offensive odors. The Campbells made an offer to purchase the house, and a contract for such sale was signed on August 31, 1973. A few days after the signing of the contract, Mr. and Mrs. Campbell and Mr. Campbell's mother again toured the house and did not detect any offensive odors. The sale was consummated about September 25, 1973, and the Booths vacated the premises about October 1, 1973. At the time the Booths left the house, it was locked, and there is no evidence that anyone entered the premises until about one week later on October 7, 1973, when the Campbells returned to take possession. On that date, when the Campbells opened the house, they immediately detected the offensive odor for the first time. This odor was determined to have been caused by canine urine which permeated most of the carpets in the house. During the next two or three weeks, the Campbells employed a rug cleaning company, using the system known as "steamatic," to attempt to clean and treat the carpets. During that same time they also had an experienced employee of the American Rug and Carpet Company and a Mr. Carr, the owner of a carpet supply and cleaning company, to inspect the premises generally. Thereafter, the carpets were taken up and removed. Samples of the damaged carpet were made and introduced into evidence. After replacing the damaged carpet with new carpet, the Campbells moved into the house. Mr. Campbell testified that he would not have entered into the contract for the purchase of the house had he been aware of the condition of the rugs which was discovered following the sale.

Mr. Campbell said that neither he nor his wife had any reason to suspect that there was anything wrong with the carpet prior to the closing of the contract of sale. When he and his wife entered the house, about two weeks later, they were confronted with

the smell which they described as "horrible." He said: "It just smelled horrible. It wasn't just a little smell like the house had been closed up a week and without substantial ventilation, it just smelled horrible." At the time the Campbells inspected the house, prior to the purchase of same, they knew that the Booths had several dogs, two Dobermans, and a smaller dog as well as several cats. At that time they did not know that the dogs were allowed in the house but did see the cats in a closet. Mr. Campbell said that on one of his inspection trips through the house that he noticed at least one candle which was burning and that his wife and the agent who was showing the house also saw it. Concerning deodorizers, Mr. Campbell testified that he observed "airwick around all over the place," which he described as "little pull-up deals" and which would act as a deodorizer. He said that at least two of these were left in the house, one in the kitchen and one in the bathroom and that they had been pulled up but they did not get rid of the odor altogether. He said that: "I would have to say over a period of time they do not, but if you put enough in there apparently you do. The thing that gave a lot of odor was a small jar that we discovered afterwards also, in the kitchen, just a little bitty jar about like this with a powerful deodorizer." In this connection he testified, in detail:

Q. And you said you found a deodorizer that seemed to work on these smells?

A. Uh, huh.

Q. Did they give you permanent relief? Did it remove them or cover them up?

A. It covered them up.

Q. Was it effective in covering them up?

A. It appeared to be very effective. .

Q. Did you try it after you found it out there?

A. I sure did.

Q. And how long would it give you re-lief in a room after you applied it?

A. I would say several hours.

Q. It lasts for several hours and when it would diminish or evaporate or whatever it does, would the smell be noticeably less or—

A. Back to the same.

Mr. Campbell further testified that after the rugs were replaced he had occasion to examine the bottom of the old carpets, and there he found stains on almost every area in every room. These stains appeared to him to be animal urine, and they had a very stringent odor.

Mr. E. H. Durham, president of American Rug & Carpet Company and an expert in cleaning and repairing rugs, examined the samples of carpet which had been taken from the premises. He said that based upon his examination the rugs were definitely stained with urine either from a cat or a dog and that the stains could not be effectively cleaned in place nor could they be effectively removed, cleaned and replaced because one could not kill the odor by cleaning. He testified that this odor could not be removed but it could be concealed to a degree by deodorizing it. He said that the deodorant would only be temporary and that the smell would return after a time. When asked about the deodorizer that the Campbells found on the premises, Mr. Durham said that this would possibly kill the odor for a length of time but that it would reappear. The deodorizer smell itself would disappear completely. He said that the deodorizer would completely neutralize a great deal of the smell but it would not ever completely remove the smell if one actually got down and put his nose on the carpet itself. Concerning scented candles, he testified they would kill odors in the air. When asked to explain the "steamatic" process of cleaning rugs, he stated that this process could not have caused the dog or cat urine smell and stains on the back of the carpets. He further testified that when carpet is wet because of the steamatic process, a urine smell could be intensified, but once it dries up again, the smell would no longer be aggravated. He

concluded, therefore, that the steamatic process would not cause an animal urine smell nor permanently aggravate such a smell.

Mr. Howard Carr, another carpet expert, personally examined the damaged carpet while in place at the residence. He testified that the backs of the carpets in question were all faded and coming apart. He said they were rotten and deteriorated and that such was caused by pet urine. He testified that he could tell the difference between a urine smell and the effect of steamatic cleaning process and that he definitely knew that the smell of the rugs in question was caused by urine. He said that: "Just to look at it from the surface it didn't appear to show wear. It showed normal wear and until you smell it, you don't recognize the damage." He said when he initially went to the house and inspected the carpet he found that: "The odor about knocked you over." He pulled the corner of the carpet up in each room to observe it and found no salvageable piece of carpet in the house. He said that in every room there was enough carpet damaged by the urine so as to make it unusable. However, there were no visible stains on the top of the carpeting, and he explained this fact by stating that these were all synthetic carpets and do not show stains on the surface. He said that at the time he inspected the carpets in the dining room and den, those rugs were still wet; that he could pick them up and twist the carpets and the urine would run out. He estimated that these wet spots were about a month old. When asked if the wetness could possibly have been caused by the steamatic cleaning a week or two prior to his visit, he replied: "If it had been steam cleaned a week or so prior it would have been wet evenly all over, and I am assuming that the people would know what they are doing and not leave it soaking wet around the wall." He positively stated that the wetness he observed in the carpeting was urine and not water and that the urine was not diluted.

Don Booth testified that he and his wife lived in the house for two years before selling it to the Campbells. During this time they had two cats and three dogs; one of the dogs was an Afghan which weighed approximately fifty pounds and the other two were Dobermans, weighing about eighty pounds apiece. For six to eighteen months of his occupation of the house, Booth testified that the two Dobermans were allowed in the house in the evenings; that the Afghan was subsequently traded for a smaller dog but during the time they owned the Afghan he was also allowed in the house at night. The cats stayed inside at all times. When asked to examine the carpet samples that were removed from his house, he admitted that they smelled offensive and that the odor was fairly strong. With regard to candles, Mr. Booth stated that there were some in the den and there was one in the breakfast room. The candle in the breakfast room had a vanilla scent. He testified:

Q. Did you burn those all the time at the time that you were showing the house to the Campbells and the folks that were looking during that period of time?

A. The candles? I can't say when the first time was, but when Mr. Campbell and Mrs. Campbell came back that afternoon I think they were probably on. It was the usual practice.

He also testified, concerning deodorizers:

Q. Did you have a deodorizer in your house at the time you were showing it for sale to the Campbells?

A. Yes, sir, there were deodorizers.

Q. Were they placed there on your own initiative or on the suggestion of your realtors?

A. They were on our initiative.

Q. Approximately how many deodorizers did you have throughout the house?

A. Well, there was—I know my wife had one of these solid deodorizers, I

don't know the brand name, in the kitchen and there was the customary one kept in each bathroom.

He was asked: "Do you recall when I asked you how many scented candles would you all light when the realtor came by with the prospective customer and you answered there were, I think, three in the den?" He answered, "Well, there were some candles over on a bookshelf that were lighted occasionally, yes, sir."

■ Appellees contend that the case is governed by the rule that fraud, because of silence as to a material fact, can only exist where the defrauded party did not have an equal opportunity to discover the true facts. That rule, however, does not apply to cases where, as here, the fraud resulted from affirmative acts of concealment.

■ Appellees also argue the implementation of the rule that while inferences may be utilized in cases of fraud, they cannot be made the basis of recovery when it is demonstrated that it is equally possible to infer a favorable motive as an unfavorable one. They contend that under this record, one may infer motives which are favorable to them. While we recognize the rule we cannot agree with appellees as to its relevancy here. When viewed in the light most favorable to appellants, this record does not contain evidence that renders it equally possible to infer a favorable motive to appellees as an unfavorable one. To the contrary the evidence is sufficient to lead only to the conclusion that appellees utilized the scented candles and other deodorizers for the purpose of masking odors caused by animal urine so that a favorable atmosphere would thereby be created when potential purchasers of the house were present.

With regard to the issue of damages, Tex.Bus. & Comm.Code Ann. § 27.01(b) (Tex. UCC 1968) provides that the measure of actual damages in a suit for fraud in a real estate transaction is "the difference between the value of the real estate  .  . as represented or promised, and its actual value in the condition in which it is delivered at the time of the contract."

■ Appellants pled the statutory measure of damages in their trial amendment. The record contains sufficient evidence of probative force to present an issue on the question of damages.

The record is undisputed that the value of the house in question, as revealed by the contract between the parties, was $69,900. While this agreed price is not necessarily synonymous with "the value as represented," as required by § 27.01, it is some probative evidence thereof. As to the value of the property in the condition in which it was delivered, the record is replete with evidence concerning the cost of replacement of the carpeting which was damaged. There is positive testimony concerning the value of the 292 yards of carpeting which was replaced, one-fourth of that amount being dark green shag, valued at the time and place of the conveyance at $7.95 or $8.00 per yard installed; one-half of light green shag valued at $8.00 or $8.95 a yard installed; one-fourth of a lighter pale pastel carpet, valued at $10.00 to $12.00 a yard installed. Testimony of carpet cleaning and deodorizing experts reveals that none of the carpet was salvageable and that the replaced carpet had a value of 0 dollars. There is also evidence that the carpeting, had it been in the condition that it was represented that it would be, would have depreciated in value by four-twelfths or four-fifteenths, considering its age and lifespan. When this evidence is considered in its entirety, we conclude that the jury could have computed "the value of the real estate as received" by deducting the value of the carpet from the contract price of the house. The figure thus arrived at would, at least, be some evidence of the value of the property in the condition in which it was received by the appellants. It must be emphasized that we are not here dealing with the question of factual sufficiency of the evidence to support a verdict of the jury, but we are viewing the record in the light of an instructed verdict, and in doing so we

must determine whether some evidence of probative force exists justifying the submission of the issue to the jury.

We believe that the rationale of the Supreme Court in *Pasadena State Bank v. Isaac,* 149 Tex. 47, 228 S.W.2d 127, 128 (1950) is peculiarly applicable in this case. While the question in that case was damage to personal property, the logic applied to the solution of the problems is the same as here. In *Pasadena,* the Supreme Court stated that evidence of the reasonable cost of repairing the damaged property to the identical condition it was in prior to the injury constitutes prima facie evidence of damages. The burden of proceeding then shifts to the defendant to allege and prove that the value of the property has been enhanced beyond the value before the injury by the repairs. This rule is based upon the sound and practical theory that in a tort action the measure of damages should reasonably and fairly compensate for the injury that results directly and proximately from the wrongful act. Such rationale applies with equal force to an action based upon fraud.

The cases of *Frey v. Martin,* 469 S.W.2d 316 (Tex.Civ.App.—Dallas 1971, writ ref'd n. r. e.) and *Thrasher v. Walsh,* 228 S.W. 961 (Tex.Civ.App.—San Antonio 1921, writ dism'd) relied upon by appellees, while involving the question of damages, are easily distinguishable from the instant case. Both cases involved exchange of real estate, and each was submitted to the court or the jury. Neither case involved the question of propriety of an instructed verdict. In *Frey,* there was an exchange of property rather than a sale, as in this instance. In that case the fraud alleged was that one of the pieces of property exchanged, an apartment complex, did not contain the number of units represented. The court in that case concluded that the value per unit of the apartments was not a proper measure of damages in the case of fraud involving an exchange of real property. In *Thrasher,* the common law measure of damage was applied, that is the difference in the amount paid for the property and the true value

thereof. The court held that since the facts alleged did not indicate what the respective values of the properties were, there was no basis upon which to compute the correct measure of damages. It is quite apparent that neither of these cases are similar to the one here and that in neither instance was there evidence of probative force on the issue of damages. As pointed out above, the testimony presented by appellants is sufficient to enable the jury to have some basis for answering the issues which should have been submitted to them on the question of damages.

When this record is viewed in its entirety, within the rules announced above, we conclude that there is more than a mere suspicion or surmise concerning the elements of fraudulent concealment and also of damages resulting therefrom. The trial court should have submitted these issues to the jury.

The judgment of the trial court is reversed and remanded.

AKIN, J., dissents.

AKIN, Justice (dissenting).

I respectfully dissent. The trial judge ruled correctly in instructing a verdict for the defendants for the following reasons: (1) plaintiffs neither pled nor proved the proper measure of damages in a suit for alleged fraud under Tex.Bus. & Comm.Code Ann. § 27.01 (Vernon 1968); (2) there is no evidence of probative value on the vital issue of alleged "fraudulent concealment" under the doctrine of *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898).

### 1. *Damages*

Plaintiffs' trial amendment included the following pertinent pleading: "That subsequent to obtaining possession of the house Plaintiffs became aware of the malodorous nature and condition of the carpet throughout the house to their damage in the amount of $1,755, being the difference be-

tween the value of the house as represented and its actual value in the condition in which it was delivered to Plaintiff, *in that the carpeting in said house had a fair market value in Dallas County, Texas as represented of $1,755 and its actual value in the condition at the time of the delivery was 0.*" [Emphasis added.] To support this pleading, plaintiffs introduced evidence of the cost of replacing all of the carpeting in the house and then applied a depreciation factor to arrive at the market value of the carpet. This pleading and evidence fail to comply with Tex.Bus. & Comm.Code Ann. § 27.01(b) (Vernon 1968) which states:

The measure of actual damages is the difference between the value of the real estate . . . as represented . . and its actual value in the condition in which it is delivered at the time of the contract.

The special issues would be the market value of the real estate as represented and the market value of the real estate as received. Admittedly, the contract of sale would be some evidence of the market value of the real estate as represented; however, *no evidence was introduced as to the market value of the real estate as received with the damaged carpet.* Thus plaintiffs have failed to plead and prove a prima facie case on damages which would require the trial judge to submit the case to the jury. If the trial judge submitted this case to the jury, then the jury would have been left to sheer speculation as to the market value of the house as received.

In *Frey v. Martin,* 469 S.W.2d 316 (Tex. Civ.App.—Dallas 1971, writ ref'd n. r. e.), a fraud case remarkably similar to the one before us, this court held that it was necessary to both *plead and prove* the market value of the property as represented and the market value of the property as received. In that case the alleged fraudulent representation was that the apartment complex contained one hundred sixty-six units, the price of which was $10,000 per unit. Frey, the plaintiff, contended and

proved that there were only one hundred sixty-two units and that, therefore, he was entitled to be compensated for the shortage of four units at the agreed rate of $10,000 per unit or a total damage of $40,000. As here, Frey attempted to apply a measure of damages compatible with a suit for damages resulting from a breach of contract. In rejecting this argument, this court speaking through Justice Bateman said:

In his brief and oral argument Frey applies a measure of damages compatible with a suit for damages resulting from a breach of contract, but this is wholly inappropriate and not permissible in this case where the petition makes it quite clear that the action is *ex delicto*—a suit in tort for a wrong consisting of fraud inducing the contract, for which the law applies a different measure of damages. *Id.* at 317.

This court then reviewed the measure of damages recoverable by a defrauded purchaser of real estate under the common law, under the former statute Vernon's Annotated Civil Statutes, art. 4004, and the current statute Tex.Bus. & Comm.Code Ann. § 27.-01(b) (Vernon 1968). This court concluded that since Frey had not alleged or offered proof under either the statutory or common law measure of damages, there was no basis in law on which the court could have rendered a judgment in his behalf. Likewise, here plaintiffs have neither pled nor proved the market value of the property as received in its alleged damaged condition. Instead, plaintiffs pled and proved the market value of the carpet as represented and as received. The difference in the value of the carpet as represented and the value of the carpet actually received is not the equivalent of proof of market value of the real estate received as a whole. *George v. Hesse,* 100 Tex. 44, 93 S.W. 107 (1906).

In arriving at the market value of real estate, improvements, such as carpet attached to the floor, may be considered only to the extent that such improvements enhance or contribute to the value of the real

estate as a whole. *State v. Wheeler*, 390 S.W.2d 339 (Tex.Civ.App.—Beaumont 1965, writ ref'd n. r. e.); *Lower Nueces River Water Supply District v. Sellers*, 323 S.W.2d 324 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.); *State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 979 (1936). It is error to permit a party to evaluate each improvement separately and then add the separate value of the improvements to the value of the real estate without the improvements to arrive at the market value of the property as a whole. Likewise, it is error to permit plaintiffs to evaluate the carpet separately and then subtract the value of the carpet from the real estate as a whole to arrive at the market value of the real estate as received.

In *Thrasher v. Walsh*, 228 S.W. 961 (Tex. Civ.App.—San Antonio 1921, writ dism'd), plaintiff sued to recover damages alleged to have been caused by a defective roof on the house purchased by plaintiff, who was induced to make such purchase by the false representation that the roof had been repaired and made rainproof. There, plaintiff sought damages for the cost of repairing the roof and replacing damaged wallpaper. From a judgment in favor of plaintiff, the court of civil appeals reversed and remanded, stating that the measure of damages is the difference in the amount paid for the property and the value of the property as received, rather than simply the replacement value of the wallpaper and the amount required for repair of the roof, citing *George v. Hesse, supra*.

The majority opinion attempts to distinguish *Frey* and *Thrasher* on two bases: (1) that each involved an exchange of real estate rather than a sale of real estate and (2) that each did not involve an instructed verdict. I cannot agree with this rationale. It is a distinction without a difference. Furthermore, the fact that this is an appeal from an instructed verdict does not relieve plaintiffs of the burden of pleading and proving the proper measure of damages.

## 2. Fraudulent Concealment

I agree with the majority that, in reviewing the record on appeal from an instructed verdict, the evidence is to be considered in the light most favorable to plaintiffs' case, discarding contrary evidence and inferences. The Supreme Court, however, recognized at an early date in *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898), that when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, such evidence is in legal effect no evidence and will not support a verdict or judgment. *Seideneck v. Cal. Bayreuther Associates*, 451 S.W.2d 752 (Tex.1970); *Western Telephone Corp. v. McCann*, 128 Tex. 582, 99 S.W.2d 895 (1937); *Texas & N.O. R.R. v. Warden*, 125 Tex. 193, 78 S.W.2d 164 (1935); see Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L. Rev. 361 (1960). The evidence of fraudulent concealment here is so weak as to do no more than create a mere surmise or suspicion of its existence and, therefore, falls within the doctrine of *Joske v. Irvine, supra*.

Plaintiffs allege that defendants fraudulently concealed the condition of the carpet from plaintiffs. With reference to fraudulent concealment, plaintiffs have suggested two theories: (a) that scented candles were burned during their three inspection tours of the house, thereby masking the odor of the alleged urine and (b) that the plaintiffs had used a powerful deodorant known as "Odors Away" plus Airwicks to conceal the alleged odor. Plaintiffs conclude from these inferences and the actual presence of the malodorous carpet that defendants fraudulently concealed the condition of the carpet from plaintiffs. I cannot agree.

### (a) Scented Candles

There is no direct evidence that candles were burned during any inspection by plaintiffs. The following testimony of Mr. Campbell is the strongest testimony in this record with reference to burning candles.

Q. Do you recall whether or not the candles were burning when you saw the house?

A. On our first trip through or on our trip through.

Q. Where were these and what were they? Could you describe them for the court and jury, please, sir?

A. *I only noticed one of them.* My wife and the agent that was showing us the house observed it. [Emphasis added.]

Campbell testified further that he did not detect any *odor* prior to signing the contract, whether dog urine, scented candles or a deodorizer. Mrs. Campbell, who visited the house three times, confirms her husband's testimony that at no time did she smell *any odors.* With reference to scented candles, Mrs. Campbell's testimony is silent. The only other testimony with reference to the presence of scented candles was the testimony of one of the defendants, Mr. Booth. Booth testified that his real estate agent recommended, among other things, that they burn candles to give the house a "homey look." He testified that there were approximately three candles in the den and one in the breakfast room. According to Booth, only the candle in the breakfast room was scented with a fragrance known as "vanilla" while the ones located in the den did not have a scent. He is not certain but states the candles in the den *may* have been burning when Mr. and Mrs. Campbell came back the second time to look at the house. He draws this conclusion because "it was the usual practice." Other testimony came from a Mr. Durham, a witness who was engaged in professional carpet cleaning. Mr. Durham testified that scented candles could *mask* odors in the air. At no time, however, did he testify that scented candles would entirely kill the odor of canine urine; in fact, he states that nothing would eliminate such odor. Clearly, if the odor had been masked by scented candles, Mr. and Mrs. Campbell most assuredly would have smelled some odor—i. e. a vanilla smell or other scent used to mask the alleged canine urine odor.

### (b) Other Deodorant

Plaintiffs' second contention of fraudulent concealment concerns the use of deodorants. It is undisputed in the record that an Airwick was used by the Booths in each bathroom and in the kitchen. They testified that this was the usual practice but could not say that there were Airwicks in use in the bathrooms or in the kitchen at the times relevant to this litigation. The Campbells' only testimony was that they found several Airwicks in the bathroom and in the kitchen when they moved into the house and began cleaning. This was also the first time they smelled the strong canine urine odor.

With reference to the use of deodorizers the following testimony of Mr. Campbell was the *only testimony* that could possibly be construed as even a scintilla of evidence as to deodorants. This testimony of Mr. Campbell on cross-examination is as follows:

Q. Well, if that is true, how do you say that the Booths concealed the smell in the house if all of these experts and cleaning deodorizers and air conditioning and all of this didn't help and it still smelled bad, how did the Booths conceal it?

. . . . .

A. There was [sic] basically three approaches that we feel were involved in it. Number one, there was Airwick around all over the place.

Q. There was?

A. Yes, sir, little pull-up deals.

. . . . .

Q. All right. Now Mr. Campbell, where in the house are you able to testify that there was Airwick?

A. I think probably the best way would be *after they left* we came in the house like there was some in the bathroom and some in the kitchen

and there were candles that had been around. *There was one candle.*

Q. I was asking you about Airwick at this point. There was Airwick in the bathroom?

A. Yes.

Q. And Airwick in the kitchen?

A. That is correct.

Q. Is that all?

A. Just these pull-ups types.

Q. Were they pulled up?

A. Yes, sir.

Q. They didn't get rid of the odor, did they?

A. I would have to say over a period of time they did not, but if you put enough in there apparently you do.

The thing that *gave a lot of odor* was a small jar that we discovered afterwards also, in the kitchen, just a little bitty jar about like this with a powerful deodorizer.

Q. Did you try that on the house?

A. Sure did.

Q. And it cleaned up like a whistle?

A. Just about like that. The man that brought that to our attention was the exterminator and he goes around houses and cleans.

.    .    .    .    .    .

Q. Do you recall my asking you questions . . . "That you don't know that they used any deodorant?"

"Answer: I don't know how. *All I know is that it did not smell unduly when I came through so how they aired it out, I don't know.*

"Question: You don't know of anything specifically that was done that you feel defrauded you other than what you think was done?

"Answer: *It would have to be what I think yes, sir.*"

Q. Do you recall those questions and answers?

A. Yes, I sure do.

.    .    .    .    .

Q. Your answer was, "I don't know how. All I know is it did not smell unduly when I came through, so how they aired it out, I don't know." Is that still your testimony? Is that still correct?

A. I do know we had those other things around so that would have to be an *assumption* that that was the method.

Q. *That is your assumption,* right?

A. *That is correct.*

Q. Okay. What else? Was there anything else that you can think of that was used?

A. I think we mentioned the candles, these little Airwicks—

Q. Candles? Maybe we did mention candles. When you went through the house you testified on direct examination that you noticed a candle, is that correct?

A. Just in the general sense. I never thought about them. Everybody has got them.

.    .    .    .    .

Q. *Do you know whether or not this candle was burning when you went there?*

A. *I didn't pay that much attention.* [Emphasis added.]

A deodorant known as "Odors Away" was left in the kitchen drawer by the Booths. The uncontroverted testimony by the Booths was that they had never used "Odors Away" except for a period of time some year and a half prior to the time in question when they used this deodorant in their child's diaper pail. Mr. Durham, plaintiffs' expert witness on carpet cleaning, however, testified that "Odors Away" was not sufficiently strong to totally eliminate or mask canine urine odor.

Considering this testimony in the light most favorable to plaintiffs, this evidence creates no more than a mere surmise or suspicion of the existence of any fraudulent concealment and is, therefore, of no legal effect. Hence, it will not support a verdict or judgment and falls within the ambit of the rule first announced in *Joske v. Irvine, supra.*

This is true because the burden of proof is upon plaintiffs to establish by competent evidence a prima facie case of fraudulent concealment. Such burden is not sustained by showing the damages *may* have resulted from the acts of defendants. Plaintiffs must show that the vital fact here—fraudulent concealment—directly follows as a reasonable inference from the basic facts and circumstances proved. When it is necessary to aid the proven facts and circumstances by conjecture, plaintiffs have failed in their burden of proof. In *Western Telephone Corp. v. McCann, supra,* the Texas Supreme Court quoted with approval the following rule from the case of *Byerly v. Consolidated Light, Power & Ice Co.,* 130 Mo.App. 593, 109 S.W. 1065, 1067 (1908):

We sanction the contention of plaintiff that the causal connection need not be shown by direct and positive evidence, but may be shown by other facts and circumstances, and that in the consideration of a demurrer to the evidence every reasonable inference should be indulged in favor of the plaintiff. But the rule is elemental that the burden remains with the plaintiff to the end of the case to establish by proof, not only the fact of the negligence averred, but also to show a direct connection between such negligence and the injury. Where the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances, and it may be stated as an axiomatic rule that whenever court or jury are left by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with conjecture or sup-

position, the plaintiff must be held to have failed in his proof. Where the evidence shows the injury might have been caused by the negligent act, but, in its aspect most favorable to plaintiff, is just as consistent with the inference that the injury might have been produced by another cause, to send the case to the jury would be to accord them the right to make an arbitrary choice between equally probable but unproved conclusions, and thus the verdict, if for the plaintiff, would be based not entirely on evidence, but in part on mere speculation and conjecture. This would mean a reversal of the rule imposing the burden of proof on the plaintiff, since the defendant, in order to prevent the jury from making him the victim of conjecture, would be forced to assume the burden of showing that his negligence did not produce the injury.

Here, fraudulent concealment is *not* the only reasonable inference to be drawn. For example, it is just as reasonable to conclude that the damage to the carpet was caused by the "steamatic" cleaning process used by the plaintiffs as it is to conclude that plaintiffs' damage resulted from "fraudulent concealment" of canine urine. Indeed, it was some six weeks after defendants had vacated the house and approximately one week after the carpets had been steamatically cleaned that plaintiffs' witness Mr. Cobb testified that the carpeting in two places was saturated with canine urine to the extent that pure canine urine could be wrung from the carpeting. It is undisputed, at least at the time the plaintiffs replaced the carpet, that the original carpet was damaged. I cannot accept plaintiffs' argument that since the carpet smelled, it was the result of "fraudulent concealment" by defendants. Such conclusion does not necessarily follow from the facts proved.

This is especially true when the conclusion to be inferred is fraud. Our courts have long held that fraud is not to be presumed but must be proved by clear and convincing evidence. *Hawkins v. Campbell,*

226 S.W.2d 891 (Tex.Civ.App.—San Antonio 1950, writ ref'd n. r. e.); *Hazle v. McDonald*, 449 S.W.2d 343 (Tex.Civ.App.—Dallas 1969, no writ).

This court in *Moore & Moore Drilling Co. v. White*, 345 S.W.2d 550 (Tex.Civ.App.—Dallas 1961, writ ref'd n. r. e.), speaking through our Chief Justice, affirmed an instructed verdict for defendant in a fraud case for alleged failure to disclose material facts. In *Moore & Moore Drilling Co.*, Chief Justice Williams set forth the elements of actionable fraud as follows:

Actionable fraud has certain fundamental characteristics; (1) there must be a misrepresentation as to material facts, either positive untrue statements, or concealment or failure to disclose facts within the knowledge of the parties sought to be charged, and as to which the law imposed upon such party a duty to disclose; (2) the complaining party must be shown to have relied upon the alleged misrepresentation to his damages; and (3) *the complaining party must, himself, not have failed to exercise reasonable care to protect himself—in other words, in a "caveat emptor" situation he must not have shut his eyes and ears to matters equally open and available to him upon reasonable inquiry and investigation.* Appellee correctly argues that disparaging inferences do not arise from lawful acts. *And inferences cannot be made [the] basis for recovery, particularly when it is equally possible to infer a favorable motive, as an unfavorable one.* [Emphasis added.] *Id.* at 555.

When Chief Justice Williams refers to not having shut eyes and ears to matters equally open and available upon reasonable inquiry I might respectfully add: nor close the nose to odor.

At the time the Campbells inspected the house, prior to the purchase contract being signed, they knew that the Booths had three dogs and two cats. They were aware that the cats and at least one of the dogs were kept in the house. The evidence here presents the classic caveat emptor situation. Not only did the Campbells know that the Booths had these dogs and cats but the contract of sale contained the following provisions:

This contract is made and entered into subject to the purchaser having five (5) working days from the date of acceptance of this contract in which to make inspections of the [h]eating, [a]ir [c]onditioning, visible [p]lumbing, and [e]lectrical [a]ppliances. Purchaser to pay for inspection; seller to pay for repairs if any. Seller agrees to deliver property free and clear of termites and termite damage. A letter from a licensed, bonded exterminating company attesting to this fact will suffice.

This clause, coupled with the fact that the Campbells were aware that the Booths had both dogs and cats and the fact that Mr. Campbell was in the real estate business, should have placed them on reasonable notice to inspect the carpeting for alleged animal urine damage. Plaintiffs were on notice of this possibility, had ample opportunity to inspect the carpet, and should have done so.

I conclude, therefore, that there was no evidence of probative value of any fraudulent concealment upon which a jury verdict could be based. The trial judge was, therefore, correct in withdrawing this case from the jury and instructing a verdict in favor of defendants.

For the reasons stated herein, I cannot concur in the majority opinion. The judgment of the trial court should be affirmed.