LONE STAR MACHINERY CORPORATION, Appellant,

v.

Leonard R. FRANKEL et al., Appellees.

No. 8058.

Court of Civil Appeals of Texas, Beaumont.

Feb. 23, 1978.

Rehearing Denied April 6, 1978.

Richard F. Bergner, Henry J. Novak, Jr., Houston, for appellant.

Ralph Balasco, Alister B. Mahon, Charles R. Gregg, Houston, for appellees.

CLAYTON, Justice.

Plaintiff below, Lone Star Machinery Corporation, brought this suit against defendants for fraud in the sale of real estate under *Tex. Bus. & Comm. Code Ann.* *§ 27.01* (1968). Plaintiff sought to recover the difference in the value as represented and the actual value of the house as delivered. The defendants below were Mr. and Mrs. Leonard R. Frankel (the sellers); Ellen English, d/b/a Ellen English & Co., Realtors, and Eunice Turner (real estate sales agent). After plaintiff had presented its evidence, the trial court granted an instructed verdict, and plaintiff has appealed to this court.

The evidence shows that on April 17, 1972, the Frankels executed an exclusive listing agreement with Ellen English & Co. for the sale of their home. The listing agent was Mrs. Bock, a real estate agent for Ellen English & Co. Mrs. Bock prepared a "listing sheet" or brochure containing data about the house. It is undisputed that this listing sheet contained numerous misrepresentations about various features of the house, including that:

1. The house was constructed of white stone (was actually brick);
2. The floor of one room was made of marble (was actually terrazo);
3. The fireplace was constructed of twenty-four karat gold anodized aluminum (was not twenty-four karat);
4. The walnut screening in the morning room was hand-carved (was not hand-carved);
5. The ceiling was 16 feet (was actually 13.6 feet);
6. Portions of the kitchen had white leather walls (was actually simulated leather);
7. The house had two 66-gallon water heaters (were actually two 50-gallon or one 50- and one 40-gallon);
8. The house had two 10-ton air conditioners (were actually two 8-ton);
9. The house had 7,180 square feet of living area (was actually only 4,970 square feet in the main house).

Mrs. Bock, a witness for the plaintiff, testified she received this information from Mrs. Frankel, although Mrs. Frankel denied this.

Mr. Roberts, the sole shareholder of plaintiff corporation, living in California at the time, desired to purchase a home in Houston and contacted Turner of English & Co. On the afternoon of January 8, Turner escorted Roberts to the Frankel home, where Mrs. Frankel showed him the house. After a short visit, he returned to the real estate office and asked for some literature about the house. At this time the "listing sheet" was presented to him. It was this "listing sheet" containing the misrepresentations upon which Roberts claimed he relied, which is the basis for Roberts' cause of action.

Plaintiff's only point of error is: "The trial court erred in rendering an instructed verdict in favor of appellees for the reason that there is ample evidence in the record in support of the allegations of appellant's first amended petition."

Since this is an appeal from an instructed verdict against plaintiff, "we must accept as true the evidence in the record supporting plaintiffs' allegations . . . ." *Constant v. Howe,* 436 S.W.2d 115, 116 (Tex.1968). "If the evidence presented is of such a conclusive character that reasonable minds could not differ as to its effect and only one conclusion may reasonably be drawn from it, only then does the question become one of law, thereby justifying the granting of an instructed verdict." *Campbell v. Booth,* 526 S.W.2d 167, 169 (Tex.Civ.App.—Dallas 1975, writ ref'd n. r. e.).

Roberts testified that he relied upon the "listing sheet," but we are of the opinion that all of the evidence given by Roberts himself clearly shows that such reliance is convincingly negated by his own acts and statements. As stated in *Griffin v. Superior Insurance Company,* 161 Tex. 195, 338 S.W.2d 415, 418 (1960): "Citing from *Stanolind Oil & Gas Co. v. State,* 1940, 136 Tex. 5, 133 S.W.2d 767, mod. 136 Tex. 26, 145 S.W.2d 569(1), 570:

" 'The authorities hold that where a litigant admits positive and definite facts, which if true would defeat his right to recover or conclusively show his liability, and such statements or admissions are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, he is conclusively bound by such admissions and cannot successfully complain if the court directs a verdict against him.' "

See *Kimmell v. Tipton,* 142 S.W.2d 421, 429 (Tex.Civ.App.—Eastland 1940, no writ), and cases cited therein. Based upon this rule we hold that the following evidence, which we must necessarily give in lengthy detail, falls within the scope of the rule announced in *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898), and *Seideneck v. Cal Bayreuther Associates,* 451 S.W.2d 752, 755 (Tex.1970), to the effect that when the evidence offered to prove a vital fact, i. e., Roberts' statement that he relied upon the "listing sheet," is so weak, when compared with his own actions and admissions, as to do no more than create a mere surmise or suspicion of its existence, such evidence is in legal effect no evidence, and it will not support a verdict or judgment.

The evidence shows that on Roberts' first visit to the home, he was shown and went into every major room of the house except the daughter's bedroom. Upon this tour Mrs. Frankel, the owner, pointed out to Roberts many of the details of the home. She showed him "the carved screen that she said she had made in California. . . ." He admits he had the opportunity to and did observe the fireplace. This first visit consumed approximately an hour and a half.

Roberts' second visit to the Frankel home occurred that same evening for approximately three and a half hours. During this time he was able to and did observe the fireplace, the walnut screen, and the floors. On the morning of the next day, the earnest money contract was signed. Before leaving for California, Roberts requested and was furnished a set of plans and specifications on the home so that he could take them back to California to show "my wife and children the house." Between the time the earnest money contract was signed and the day the closing took place (from January 9 to February 23), Roberts made two more visits to the Frankel home. On these visits Roberts, his wife, and children walked through the house, and his wife "visually" looked at the home.

Roberts had a fifth visit to the home prior to the closing date. He personally requested an opportunity to be shown "how the house operated electrically, mechanically, air conditionalized, where the fuses were and water was to turn on the sprinkler system and shut off the water and things of that nature." During this visit, Mr. Frankel met with him and showed him the hot water heaters, the pool equipment, the air conditioning units, and the fuse box. He testified that he made an examination of these items. Mrs. Frankel testified that Roberts "got down on his knees and looked at" the hot water heaters. Roberts acknowledged that "no one at any time ever

made any effort in any way whatsoever to prevent . . . [him] from making an inspection of anything in that house."

We must determine if the inspections and information gathered by Roberts come within the rule as enunciated in *M. L. Mayfield Petroleum Corporation v. Kelly*, 450 S.W.2d 104, 110 (Tex.Civ.App.—Tyler 1970, writ ref'd n. r. e.), wherein the court states:

"We believe there is a further reason that the judgment was properly rendered for defendants and that is because of the authorities which hold that no purchaser who relies on his own investigation may successfully assert that he relied upon representations made to him by his vendor. If a purchaser makes a personal investigation which is free and unhampered and the conditions are such that he must obtain the information he desires, he is presumed to rely upon his own investigation rather than on representations made to him by his vendor. 174 A.L.R., page 1037, Sec. 8; *Marcus v. Kinabrew*, 438 S.W.2d 431 (Tex.Civ.App., Tyler, 1969, n. w. h.); *Whitsel v. Hoover et al*, 120 S.W.2d 930 (Tex.Civ.App., Amarillo, 1938, writ dism.); *Spark v. Lasater*, 234 S.W. 717 (Tex.Civ.App., San Antonio, 1921, n. w. h.)."

Roberts was not a complete stranger to the building or construction trade. He had acted as his own general contractor in building a home in California, directed the remodeling of a warehouse and office building for a company with which he was associated, and worked as a trader of equipment for over twenty-seven years. In connection with building his own home, he had sent out requests for bids from subcontractors, received their proposals, and supervised the work of the subcontractors. He personally selected the materials to go into the house. The completed home had "eight thousand and some square feet under roof and approximately five thousand or more which was living area." The home sold for $300,-000. We believe Roberts' experience is significant with reference to his possession and reading of the plans and specifications of the Frankel home. After he received the plans and specifications, he returned to California taking them with him. At his home he "opened them up and showed them" to his family. In examining them they "went through them page by page."

One sheet of the plans clearly and very definitely shows sixteen areas of the exterior walk being marked as "brick." The north elevation shows three areas as being brick, two areas being glass, and one area being concrete block screen. The other elevations show the exterior walls as being of brick, glass, or "board on board." There is no area of the exterior walls being shown as "stone." In addition to these facts, Roberts also testified he looked at the exterior walls and "maybe ran my hand on it." The plans very clearly showed the ceilings as being 13.6 feet high, and not 16 feet, as shown in the "listing sheet." He further testified the plans showed that they were drawn on a "quarter-inch scale," and he could have calculated the size of the rooms from the plans even if the rooms lacked dimensions on the plans. He further admitted that the plan "does pretty much show the living area in the main house." Roberts testified that Mrs. Frankel told him the plans "were not complete and they were not accurate because many changes were made." Mrs. Frankel testified the plans "are complete" and that "you will find on those plans everything in the house that is on those plans." The only change which had been made was to "flip the wing over whereby the master bedroom was on the patio overlooking the pool. . . ."

Roberts further testified that he had decided to purchase the house at a figure that was interesting to him prior to the time the "listing sheet" was given him. The following testimony is pertinent:

"Q. And the point is that you had decided that you wanted to buy that house at that figure, and you had never even known of the existence of any brochure . . .?

"A. For a $225,000.00 price I did not see the brochure. That came out later.

"Q. . . . [Y]ou didn't even dream of the existence of any brochure or

anything like that until later . .?

"A. Yes.

"Q. . . . [Y]ou did not rely on anything that anybody had shown you. You relied upon your own visual personal inspection when you decided that you wanted to buy this house, isn't that true . . .?

"A. My visual inspection had part to do with it, but I didn't make a firm offer even . . ."

Based upon his personal inspection of the home as outlined above, and the facts coming to his knowledge upon examining the plans and specifications, we are of the opinion this case falls squarely within the rules stated in the *Mayfield Petroleum* case, supra. The plans and specifications clearly showed that the representations in the "listing sheet" were clearly false as to the square footage of the house, the height of the ceilings, and the materials used in the exterior walls. The plans were so clear as to these items, it would certainly put Roberts on sufficient notice of such discrepancy between the plans and the "listing sheet" as to create a duty upon him to make further inquiry as to these items. Probably the most illuminating bit of evidence came out in Roberts' deposition, the following portion being in the record:

" 'Q. Do you consider you were capable enough to buy property based upon your visual inspection of the property?

'A. It was my money and I can spend it any way I like.

'Q. Is that a "yes" answer?

'A. I was willing to roll the dice.'

Q. Was that your testimony?

A. Yes, it was."

The three major or material items involved in the "listing sheet" would be the size of the home, the ceiling heights, and the materials of the exterior walls. The falsity of the representations were made known to Roberts. It is true that this knowledge was obtained after the earnest money contract was signed. However, Roberts admitted that "Frankel told me that if

I got back out to California for some reason I couldn't complete the transaction, we would try to break it as gentlemen."

It is not necessary that all the representations made in the "listing sheet" were false. The fact that Roberts knew of the falsity of the representations in any material particular is sufficient to defeat his recovery. It is held in *Allen v. Lasseter,* 35 S.W.2d 753, 757 (Tex.Civ.App.—Waco 1931, writ ref'd) that "The right to set aside a contract . . . on the ground that the same was induced by false representations is defeated if the party claiming to have relied thereon knew that such representations were false in any material particular. It is not necessary that he should have known that the representations were wholly false, or the exact extent of their falsity. [citing cases]"

Under the authorities and the facts of this case, we are of the opinion Roberts' knowledge of the falsity of the material representations was sufficient to show that he did not rely on the "listing sheet." The trial court properly granted the instructed verdict against plaintiff, and the judgment of the trial court is affirmed.

AFFIRMED.