**SPARK et ux. v. LASATER et al.   (No. 6603.)**

(Court of Civil Appeals of Texas. San Antonio. Oct. 19, 1921. Rehearing Denied Nov. 16, 1921.)

**1. Trial ⬨⟿139(1)—Cause for jury where there is evidence to support pleading.**

Where the pleadings of a party state a cause of action, and there is any material evidence to support the cause of action alleged, the trial court has no authority to direct a verdict against such party, but must submit the cause to the jury.

**2. Appeal and error ⬨⟿927(7) — Evidence of losing party taken as true in reviewing peremptory instruction.**

While the appellate court must uphold the judgment of the trial court if it can lawfully do so, yet, in testing the propriety of a peremptory instruction, the evidence introduced by the losing party must be taken as true.

**3. Vendor and purchaser ⬨⟿37(4) — Verdict properly directed for defendant in action to rescind sale of land.**

In an action by purchaser to rescind sale of land on ground that defendants stated that the tract was all farm land, when in fact there were lagoons, brush, and spots where hardpan came to the surface, the court properly directed a verdict for defendant where plaintiff testified that he went over the land, and that defendant told him of the lagoons.

**4. Compromise and settlement ⬨⟿16(1)—Agreement held compromise of controversy arising out of vendor's false representation.**

Where, after discovery that vendor had falsely represented boundary of tract conveyed, the parties entered into an agreement that boundaries remain as stated in the conveyance, wherein vendor obligated himself to clear 80 acres of land and put an additional wire on the fence at all expense of more than $1,000, there was a compromise and settlement which barred a subsequent rescission by the seller by reason of such false representation.

Appeal from District Court, Jim Wells County; Hood Boone, Judge.

Action by George Spark and wife against Ed. C. Lasater and another. Judgment for defendants, and plaintiffs appeal. Affirmed. See, also, 232 S. W. 346.

John W. Wilson, of Falfurrias, and Perkins & Floyd and C. C. Forry, all of Alice, for appellants.

G. R. Scott, Boone & Pope, of Corpus Christi, for appellees.

SMITH, J. On February 28, 1917, George Spark and wife, residents of South Dakota, entered into a contract with Robert G. Miller, of Falfurrias, whereby the former agreed to purchase 1,329.5 acres of land belonging to Ed. C. Lasater, and situated in Jim Wells and Brooks counties. The price agreed upon was $53,180, or at the rate of $40 an acre, payable $19,942.50 in cash on December 1, 1917, for which Spark gave his note, and the balance of $33,237.50 in 10 equal annual payments, to be evidenced by vendor's lien notes. No money changed hands at the time, and it was agreed that the cash payment was to be made when it was realized out of the sale of Spark's land in South Dakota, which Miller Bros. undertook to sell for Spark. On December 1, 1917, the time for making the cash payment was, by supplemental contract between the parties, extended for six months, and on August 27, 1918, the original contract was superseded by a new contract, in which the essential elements of the original agreement were embraced. At that time it seems the cash payment had been made in satisfactory terms, and the deed from Lasater to Spark had been executed, dated July 12, 1918, but not delivered. Spark's 10 notes, too, had been executed, as of date June 1, 1918, but not delivered. It was provided in the contract of August 27th that Spark could take possession at any time, but that the deed should be held in escrow in a named South Dakota bank until the South Dakota land transaction should reach a certain stage, when the Spark notes would be delivered to the Millers. On August 28th the parties entered into a supplemental agreement which it is not necessary to describe here, and on April 14, 1919, they entered into another agreement by which they settled a controversy arising on account of Spark's contention that the deed of conveyance did not include a 240-acre strip which he claimed Miller showed him as a part of the land to be conveyed. All these various contracts and agreements were in writing.

On November 29, 1919, Spark, joined by his wife, brought this suit, in two counts, in one of which he sought to rescind the sale of the land, and in the other to recover damages. As a basis of the suit Spark alleged that he was induced to enter into the purchase of the land by reason of fraudulent representations of Robert G. Miller as to the location, quality, and topography of the land. At the conclusion of the evidence the trial court instructed the jury to return a verdict for defendants, Miller and Lasater, which was done, and judgment was rendered accordingly.

[1, 2] It is settled, of course, that where

the pleadings of a party state a cause of action, and there is any material evidence to support the cause of action alleged, the trial court has no authority to direct a verdict against such party, but must submit the cause to the jury. And while it is true that the appellate court must uphold the judgment of the trial court if it can lawfully do so, yet in testing the propriety of the peremptory instruction the evidence introduced by the losing party must be taken as true. Of course if, when this is done, and the evidence of the losing party is considered for all it is worth, no reasonable mind could differ from the judgment rendered, then that judgment should not be disturbed on appeal.

Spark, at the time of this transaction, was 51 years old. He had devoted his entire life to farming in South Dakota, and had been successful in this pursuit, accumulating several hundred acres of valuable land in Dakota. In February, 1917, he visited Brooks county, Tex., for the purpose of purchasing a stock farm. He got in touch with Robert G. Miller, a member of the firm of Miller Bros., who, among other activities, were agents for the sale of lands belonging to Ed. C. Lasater, who owned extensive land and other interests in that section. He told Miller he wanted a "stock farm," and Miller showed him several of the Lasater properties, finally coming to the tract involved. According to his own testimony, Spark made three visits to the tract before agreeing to purchase it. On the first trip he did not go over the land. On the second, in Miller's company, he made a diamond-shaped survey of the tract, which was in the form of a square; that is to say, he entered near the center of the south line, and, following cow trails, traveled first to near the center of the east line, thence to within sight of the center of the north line, thence to near the center of the west line, and back to the center of the south line, where he had entered. He testified that this "put him pretty well over the land," which "looked pretty good on the surface." In this trip of inspection, the land coming under his observation was brushy, more so in some places than others, and particularly so in the center, where the brush was so thick they could not drive their buggy through it. He saw at least one "lagoon," and Miller told him of another near the center of the tract. He did not say whether or not he saw any "low places," but admits that Miller then told him there were several such places on the land. He "saw the land and could tell the character of the soil from the surface," but "didn't know what was underneath the surface; * * * the color of the soil around those lagoons is chalky and gray. It is not dark around those low places." He did not go over the place on the third visit. He testified that, on the occasion of these visits, and before the con-

tract was made, Miller made these representations to him:

"That it was all farming land;" that "there was no difference in this land—it was all alike;" that "there was a place north of the well (near the south line) always the Mexicans said they could get good stock water;" and that there were "two or three low places on the north side of the place"—"some low places in one end," "one or two low places in the north end of it," "a few low places on the north end; I can't recall that he said much of anything else, except speaking of the land generally;" that "Mr. Miller represented the land as being the very best proposition he had in an agricultural line;" that "it would raise anything any other land would raise, and the price was $40 per acre;" that "it is worth $40 per acre;" that "they had nothing for less than $35 to $40 an acre; he did not tell me about any one else having land there."

On cross-examination Spark further testified in this connection that—

Miller "told me that land was worth $40 per acre. He might have said that he priced it to me at $40; he might have told me that none of that land could be bought for less than $35 or $40;" "I think I asked Mr. Miller what the land was worth, and I think he said it was worth $40; they said that the land would grow anything. I don't think he specified any special thing that would grow on it. He said that you could make corn; and that from the well to the road would make a fine orange orchard."

This statement embraces all the representations Spark testified to with reference to the quality and topography of the land. He testified further, however:

That Miller pointed out a strip of about 240 acres lying along the line east of the tract involved as being included in the land to be conveyed, but that this strip was not so included, and that this strip was "good farm land," and "there was no comparison between the land they showed me and the land I got."

After entering into the contract on February 28th to purchase the land, Spark went back to South Dakota. He returned to Brooks county for a few days the following October, but did not go over the land on that occasion. In February, 1919, he came with his family to Falfurrias, and went out to the land two or three times, going over it at least in part, going as far as the center of the tract on one occasion. He took possession on March 1st. He permitted Miller to pasture some of the latter's live stock on the land, and collected rent therefor for the months of March, April, May, and perhaps July. Early in April he rode horseback over part, but not all, of the tract, going at least as far as the center, to select some of the land to put in cultivation, and on this occasion discovered some lagoons, as well as several low places filled with water near the center of the tract, which he says he did not see when he went over the land with Miller.

On April 14th he made a supplemental contract with Miller, heretofore adverted to. By April 22d he finally accepted the deed to the tract, and on that date filed it for record. On June 1st the first of the 10 purchase-money notes matured, and he paid it off to a San Antonio Bank, the then holder. On November 29th he filed this suit.

[3] Spark's contention was that Miller's representations, as we have stated them, were false, and in support of this contention testified that, instead of being level, all alike, and good farming land, the land actually conveyed to him was very brushy, had several "low places" on it, and that there was no soil on these low places; that some places on the surface was "hardpan"—so hard that it could not be cultivated—which he said crops out on the surface at some points; that there were a number of "lagoons" on the land; that only about two-thirds of the tract was farming land, and that the balance was not fit for farming purposes; that he did not know of the presence of the low places and lagoons, or the hard surface spots, until after he took possession, and did not know of the full extent of these objectionable features until after he made the settlement on April 14th, and accepted and filed his deed on April 22d.

Appellees contend that Spark knew of these matters about which he now complains before he made the original contract or the settlement on April 14th, and before the deal was finally consummated, and therefore waived his right to complain. Moreover, appellees contend vigorously that, without reference to the question of waiver, the representations of Miller to which Spark testified were not of such nature as to constitute fraud, and that Spark in fact went over the land and saw for himself, and could not have been misled as he alleges. From a careful study of the record, we have concluded to sustain these contentions.

Spark himself testified that before agreeing to purchase it he made an inspection of the land, which "put him pretty well over it." He complains of the "lagoons," and yet testified that on this inspection he saw at least one lagoon, and Miller told him of another, the one of which he now chiefly complains. He complains of the "low places," and yet testified that Miller told him there were some such places on the tract. He complains that Miller represented to him on the occasion of this inspection trip that the land was all alike, and would be good farming land when cleared of the brush on it; but his testimony shows that these representations were made after telling Spark of the low places, and with at least one lagoon in Spark's view, and the knowledge of at least one other in his mind. He complains of the "hardpan," but testified that this peculiar soil "comes clear to the surface in places";

that on his trip of inspection he "saw the land and could tell the character of the soil from the surface," and described the unusual color and characteristics of the soil, and conceded that Miller made no representations about the nature thereof. He complains of the very brush which he testifies obscured his view and obstructed his progress on the initial inspection trip.

This representation, then, that the land was all alike and good for farming, could have meant nothing more than that there was a tract of 1,329 acres of land before Spark's eyes largely covered with a brushy growth, with some low places and lagoons on the surface, and good for farming purposes, and with this representation in mind Spark went over the tract and saw for himself. He had spent 50-odd years farming, had been quite successful in the pursuit, and with all the knowledge thus gained in the best school, and with the affirmative information given by Miller, which seems to have been a true index to the topography of the land, he went "pretty well over the tract," and after such inspection solemnly entered into the contract to purchase it. He was 20 years older than Miller, his rather extraordinary success as a farmer and landholder showed him to be a sound business man and sagacious trader in farm lands, and it is inconceivable that he was deceived by what he saw and heard on the occasion of his inspection of this land. We think, and so hold, that by his own testimony, as a matter of law, he is precluded from complaining of the brush, the low places, the hard-surfaced spots, or the lagoons upon the land.

According to Spark's testimony, Miller made no representations as to the character of the soil, except as such representations might have been implied from the statement that the land was all alike, and was suitable for agricultural purposes, subject to certain characteristics of which Spark then had knowledge. But this representation could not possibly have meant anything more than that the tract generally was like the portions Spark inspected on the occasion of the representation, and subject to the defects then and there apparent to both. Miller could not have meant, nor could Spark have been deceived into believing from the statement, that the land was all free from brush, since the brush was everywhere apparent to both Miller and Spark; nor that there were no lagoons or low places on the land, when samples of both were lying there before the eyes of both men, nor that the soil was all 'dark and rich, when they both saw that it was "chalky and gray" all around the lagoons, and "not dark" around "those low places," while the hardpan "comes clear to the surface in some places," to quote from Spark's testimony. Miller could not have meant to declare, nor could Spark have been

deceived into the belief, that the land covered by the obvious lagoons was tillable, or that the low places would not fill with water when it rained, and, besides, Spark testified that he "saw and could tell the character of the soil from the surface." All these matters were obvious to Spark, who went "pretty well over" the land, and whose 50 years' successful farming must have taught him these simplest lessons. His attention was affirmatively called to the very things which determined the character of the land, and the very same peculiarities of which he afterwards complained were known to him or were pointed out to him on the ground, with the assurance that the balance of the tract was like the portions he saw. Under these facts he cannot be heard to come into our courts nearly three years after he contracted to buy the land, and six months after all the details of the transaction had been finally closed, and demand that the sale be rescinded, or that the courts write for him a new contract, by which half the agreed price shall be taken from the seller and given to him.

The crux of appellants' complaint, however, seems to lie in the contention that, when Spark made the inspection before the agreement to purchase, Miller showed him the 240-acre strip and assured him that this strip was a part of the tract to be conveyed, but that it was in fact not so included. Although Miller stoutly denied this alleged representation, there was a sharp conflict in the evidence upon the point, which could have been settled alone by the jury but for the fact that this controversy was subsequently adjusted between the parties. Spark testified that some time in March, after taking possession of the land, and after going out to it several times, he discovered that this strip had been excluded from the fence, and on March 21st he wrote Miller at San Antonio about the matter, saying, among other things, that—

"When I buy anything I like to have the goods delivered to me as bought; but it doesn't seem to be so in this case. Now, Mr. Miller, I think it is your business to come down here and straighten this out. You were the one I did business with, you drove me over the land."

[4] In response to this letter Miller went to Falfurrias on April 14th, had a conference with Spark, and on the same day they reached an agreement, which was reduced to writing, and by which the controversy was settled by Miller obligating himself to clear at least 80 acres of the land conveyed, at an expense of at least $1,000, and to put an additional wire on the fence around the entire tract, leaving the lines as they then were. Two days later Spark wired his attorney in Dakota that all the matters in controversy had been settled satisfactorily to him, and urged his attorney to at once pass on the title to this land. A few days later, on April 22d, he received and filed the deed for record. Spark testified that in making this settlement the question of the fence line was the only controversy discussed or adjudicated, and that he had not then discovered the other objections complained of in his suit. But, in addition to the lagoons and low places he saw on the land, or was specifically advised of, when he went over it before agreeing to buy it, Spark, himself, testified that in the first part of April, and before making the settlement on April 14th, he went out to the land, and went about over it on horseback for the purpose of selecting some of it to put in cultivation, and on this occasion discovered some lagoons, as well as several ponds, near the center of the tract, which he says he did not see when he went over the land with Miller. In this way, it seems to be shown conclusively by his own testimony that Spark knew about all these conditions before he made the settlement of April 14th. Moreover, the mere fact that he complained about the exclusion of the 240-acre tract necessarily imports prior knowledge of the true merits or demerits of the main tract, since it was by this knowledge alone that he instituted the comparison of the poorer qualities of the larger with the better qualities of the smaller tract, resulting in his vigorous complaint at the exclusion of the latter, and consequent settlement of April 14th. For these reasons, then, it is obvious that Spark entered into the contract of April 14th with his eyes open wide to his true situation, and that in entering into that contract he waived any right he might have theretofore had, either to rescind the original and supplemental contracts, or to recover damages by reason of Miller's alleged representations. And the acts of Spark in continuing, after this time, to affirm the original contract by exercising all the rights of ownership of the land involved, by accepting and filing for record on April 22d the deed to the land, by accepting rents from Miller for the use of the land up to and through the following July, by paying the first note on June 1st, and by maintaining silence and continuing in possession of the property, and offering no complaint, up to the filing of this suit on November 29, 1919, nearly three years after entering into the original contract—this conduct served to emphasize and confirm that waiver.

In each of their eight assignments of error appellants complain of the insufficiency of the evidence to warrant the peremptory instruction of the lower court in favor of appellees. The conclusions we have reached require us to overrule each of these assignments, for the reasons given.

The judgment is affirmed.