KERRVILLE HRH, INC., Appellant,

v.

CITY OF KERRVILLE, Appellee.

No. 04–89–00220–CV.

Court of Appeals of Texas,
San Antonio.

Dec. 19, 1990.

Rehearing Denied Feb. 6, 1991.

**380**

Mike Willatt, Austin, for appellant.

Alan Dale Hickes, Plunkett, Gibson & Allen, Melvin A. Krenek, Melvin A. Krenek & Assoc., San Antonio, Thomas S. Terrell, Kerrville, for appellee.

Before REEVES, BIERY and CARR, JJ.

## OPINION

REEVES, Justice.

Appellant, Kerrville HRH, Inc., sued the City of Kerrville for damages arising out of a leasehold agreement between the parties. HRH sued for violations of the Deceptive Trade Practices Act (DTPA), breach of express and implied warranties, and for fraud in a real estate transaction. A jury answered most questions in HRH's favor, but the trial court awarded HRH only 51 percent of the damages found by the jury based on a finding that HRH could have avoided 49 percent of its damages but for its negligence.

In its first six points of error HRH claims that the court erred in reducing the jury award by 49 percent. In its seventh and eighth points it argues that the court erred in failing to award it an amount representing interest paid on money borrowed to operate its business on the leasehold, plus 40 percent of that amount as

attorneys fees. The City brings nine cross points.

The City owns a 200 acre piece of land known as the City Farm. At the time of the lease in question, it used the farm to dispose of the effluent from its sewage treatment plant by way of an irrigation system installed for that purpose. HRH leased the farm to grow wholesale nursery products including St. Augustine grass, shrubs and trees. The lease commenced on January 1, 1985 with a termination date of December 31, 1996.

HRH encountered numerous problems with the irrigation system during the course of the lease. HRH was able to repair and rehabilitate the system in a 7–acre tract known as the tree farm where 13,000 oak and crepe myrtle trees were planted. HRH also began rehabilitation work in a 20–acre field in which it planted St. Augustine grass. However, after the grass had been planted, new problems with the system arose which eventually resulted in ruination of the field. While the work on the St. Augustine field continued, work was begun on two other sections of the farm. These sections were also found to be in need of extensive repair. It was at this point that HRH decided that it could not continue to make the repairs. The parties continued to negotiate for a time but were unable to reach a satisfactory resolution. Eventually the City decided to build a new treatment plant and to discontinue irrigation of the farm.

The jury concluded that HRH was due $246,167.53 in out-of-pocket expenses and $25,000.00 in lost profits plus 40 percent of those amounts as attorneys fees. The trial court awarded HRH $193,613.63, representing these damages plus attorneys fees, reduced by 49 percent.

## TORT CLAIMS ACT

■ Several of the City's cross points will defeat HRH's recovery, therefore we will discuss them first. The City asserts in its second cross point that the Texas Tort Claims Act shields it from liability in this suit. The Tort Claims Act waives a governmental unit's immunity from tort suits in certain specified instances. TEX.CIV. PRAC. & REM.CODE ANN. §§ 101.021, 101.025 (Vernon 1986). Because this suit does not involve a tort claim, the Act is inapplicable and the cross point is overruled.

## DTPA JURISDICTION

■ In its fourth cross point the City argues that a city cannot be a defendant in a DTPA action.

A "consumer" may maintain a DTPA suit when specified actions of a "person" constitute the producing cause of actual damages. DTPA § 17.50(a).[1] "Person" is defined as "an individual, partnership, corporation, association, or other group, however organized." DTPA § 17.45(3). HRH argues that the term, "other group," includes cities. It offers little authority to support this conclusion other than the argument that if the legislature had meant to exclude cities, it could easily and specifically have done so. HRH cites as an example the definition of "business consumer" which specifically excludes "this state or a subdivision or agency of this state." DTPA § 17.45(10).

■ Our goal in interpreting the DTPA is to ascertain the legislature's intent, and to do so we examine the entire Act rather than isolated portions. *Woods v. Littleton,* 554 S.W.2d 662, 665 (Tex.1977). Legislative intent rather than the strict letter of the Act, will control. *Pennington v. Singleton,* 606 S.W.2d 682, 686 (Tex.1980). The legislature has determined that the DTPA is to be:

liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and

---

1. All references to the DTPA are to TEX.BUS. & COM.CODE ANN. §§ 17.41 *et seq.* (Vernon 1987 and Vernon Supp.1990).

economical procedures to secure such protection. DTPA § 17.44. The supreme court has said that the range of possible defendants under the Act is limited only by the exemptions provided in DTPA § 17.49 (which do not include cities). *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 706 (Tex.1983). But we also note that for the legislature to waive the sovereign immunity of a governmental unit, it must do so by clear and unambiguous language. *Duhart v. State*, 610 S.W.2d 740, 742 (Tex.1980); *City of Corpus Christi v. Acme Mechanical Contractors, Inc.*, 736 S.W.2d 894, 906 (Tex.App.—Corpus Christi 1987, writ denied).

■ The phrase "this state, or a subdivision [2] or agency of this state," is included in the definition of consumer, DTPA § 17.45(4), but does not appear in the definition of person. While every word of a statute must be presumed to have been used for a purpose, it is also the case that every word *excluded* from a statute must be presumed to have been excluded for a purpose. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981). Only when it is necessary to give effect to the clear legislative intent can we insert additional words or requirements into a statutory provision. *Id.* The use of the phrase "other group" does not evidence a clear and unambiguous legislative intent to include cities within the range of possible DTPA defendants, especially given their plain inclusion within the definition of consumer. Our opinion is that the legislature intended to include cities within the range of possible plaintiffs under the Act, but to exclude them as defendants. The exclusion of the state, its subdivisions and agencies from the definition of "business consumer" indicates only that these governmental bodies were to be treated as consumers but not as business consumers.

■ One final matter needs to be addressed. The cause of action for breach of an express or implied warranty is not limited to "persons." DTPA § 17.50(a)(2). While this might permit the argument that these actions may be brought against cities, we do not view this as a clear and unambiguous waiver of governmental immunity. It would be incongruous for the legislature to retain immunity for three of the DTPA's causes of action and waive it for the fourth in such an equivocal manner.

The cross point is sustained.

### REAL ESTATE FRAUD

■ HRH sought relief under TEX.BUS. & COM.CODE ANN. § 27.01 (Vernon 1987) which provides damages for persons injured as the result of fraud in real estate transactions. Fraud in a real estate transaction consists of a:

(1) false representation of a past or existing material fact, when the false representation is

(A) made to a person for the purpose of inducing that person to enter into a contract; and

(B) relied on by that person in entering into that contract; or

(2) false promise to do an act, when the false promise is

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to a person for the purpose of inducing that person to enter into a contract; and

(D) relied on by that person in entering into that contract.

Section 27.01(a). A person who makes a false representation or false promise commits the fraud described in subsection (a) and is liable to the person defrauded for actual damages. Section 27.01(b). Thus, under the act, "persons" are both the defrauders and the defrauded.

The City argues in its third cross point that section 27.01 does not apply to municipalities because sovereign immunity to such suits has not been waived. Section 27.01 does not define "person." For that

---

**2.** Cities are considered subdivisions of the State. *Welch v. State,* 148 S.W.2d 876, 879 (Tex.Civ. App.—Dallas 1941, writ ref'd).

definition we turn to the Code Construction Act. This Act applies to codes enacted, amended or revised by the 60th or a subsequent legislature as part of the state's statutory revision program. TEX.GOV'T CODE ANN. § 311.002 (Vernon 1988). Section 27.01 was enacted by the 60th Legislature as part of its codification of the Business and Commerce Code. Business and Commerce Code, ch. 785, § 1, 1967 Tex.Gen.Laws 2343, 2603. The Code Construction Act contains a list of definitions which applies "unless the statute or context in which the word or phrase is used requires a different definition." TEX. GOV'T CODE ANN. § 311.005 (Vernon 1988). "Person" is defined to include "government or governmental subdivision or agency...." TEX.GOV'T CODE ANN. § 311.005(2) (Vernon 1988). The legislature is presumed to have used the term, "person" in section 27.01 with the knowledge that that term was defined in the Code Construction Act to include governments. *Allen Sales and Servicenter, Inc. v. Ryan,* 525 S.W.2d 863, 866 (Tex.1975). If the legislature did not intend to include governments within the act, it may exclud them by definition. We hold that municipalities are subject to liability under section 27.01.

■ The jury found that the City made false representations of past and existing material facts to induce HRH to enter the lease; that HRH relied on these false representations; that they were made with actual awareness of their falsity; and that they were the proximate cause of HRH's damages. The City argues that there was no evidence or insufficient evidence to support the submission of these issues. The trial court has wide discretion in determining the proper issues and instructions to be submitted to the jury. *Mobil Chem. Co. v. Bell,* 517 S.W.2d 245, 255 (Tex.1974). Controlling issues, properly supported by the pleadings and the evidence, must be submitted to the jury. *Brown v. Goldstein,* 685 S.W.2d 640, 641 (Tex.1985). A trial court may not refuse to submit a question merely because the evidence was insufficient to support a judgment; it may refuse to submit a question only if no evidence

exists to warrant its submission. *Id.* Viewing the evidence most favorable to the question's proponent, if there is any conflicting evidence in the record of probative value, the question is for the jury's determination. *Phillips Pipeline Co. v. Richardson,* 680 S.W.2d 43, 48 (Tex.App.—El Paso 1984, no writ).

According to this standard, the evidence warranted the submission of the issues. During negotiations, the City made numerous representations to HRH primarily through Calvin Neely, who was then its public works director. A 65 acre portion of the farm that was an old landfill was not irrigated. Neely said the City was required to reinstall irrigation lines on that portion and that this would be done by smoothing off the surface, installing six inches of topsoil and laying the lines on the surface. HRH was shown plans of the remaining 135 acres illustrating and describing the irrigation system, and was told that it worked as described and that the City was required by the Water Commission to operate and maintain the system as shown on the plans. The City said that the sprinkler heads threw water over such a radius that ensured full coverage of water over the acreage. HRH was told that the irrigation lines on the 135 acre portion of the farm were below the surface and that the sprinkler heads could be removed to allow mowing of the entire 135 acres. HRH was told that the City had a staff of three whose primary responsibility was to maintain the irrigation system. The City also guaranteed that a minimum of 400,000 gallons of water per day would be available to HRH. There was testimony that HRH entered the lease based on these representations.

HRH presented evidence that the system did not operate as promised. It was discovered that many irrigation lines were broken, and that water running out of the holes had caused channels several feet wide and deep to form. In a 20-acre section the irrigation lines had long ago been cut when the City plowed the sludge from the sewage treatment plant into this area. Most of the sprinkler heads were broken or

unusable, and heads with a 150 foot radius were no longer available. Installation of heads with a 65 foot radius, which could be obtained, would result in dry areas between the irrigation lines. Correcting the problem would require installation of new lateral lines between the original lines. Shut-off valves that were originally operated electronically from the pump house did not work and had to be operated manually. However, they were not designed to be operated manually and soon became unusable. The only way to shut off the water was to turn off the main pump at the pump house, but this caused the lines to drain, which resulted in large jets of water being emitted from the sprinkler heads. These jets dug trenches which ruined the St. Augustine field. Further, the three man crew that was supposed to fix problems with the system was unavailable due to other work.

We conclude that there was ample evidence for the submission of the section 27.01 questions to the jury.

■ The City argues there could be no inducement on its part because HRH first approached it about leasing the farm. We find nothing in section 27.01 that limits its application to those situations where the defrauded party initially approaches the fraudulent party. Once discussions regarding the lease got underway the City showed interest in leasing the farm. It had been exploring ways to generate additional revenue without raising taxes.

■ The City asserts that Neely's representations cannot serve as the basis for fraud because they "were nothing more than his expressions of opinion that to his knowledge the irrigation system was in good working condition." As Director of Public Works for the City, it was Neely's job to know the condition of the irrigation system. He told HRH that the irrigation system was as represented in the plans, that the City was required to maintain it in good working order under its permit from the Water Commission, and that the system was kept in good working order with the three man crew. These are material representations of fact by a person whose responsibility it was to know the truth or falsity of the representations. They are not mere expressions of opinion. See Polk Terrace, Inc. v. Harper, 386 S.W.2d 588, 593 (Tex.Civ.App.—Tyler 1965, writ ref'd n.r.e.) (house was represented to have been constructed in accordance with Veterans Administration standards but concrete fell far short of the strength requirement). Even if Neely had not known his statements were false, they would still constitute the basis for an action in fraud. Wright v. Carpenter, 579 S.W.2d 575, 579 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); Polk Terrace, 386 S.W.2d at 593.

■ The City also argues that one who makes an inspection of the premises prior to entering into the transaction may not complain of fraudulent representations of the seller or lessor. It cites Spark v. Lasater, 234 S.W. 717 (Tex.Civ.App.—San Antonio 1921, no writ). In Spark, the court found that the purchaser not only had inspected the property but had discovered the defects of which he complained. 234 S.W. at 719–20. While in the present case HRH inspected the property, many of the defects were neither discovered nor discoverable. Many of the broken lines were underground. The defects in the sprinkler heads were not readily discoverable. Many of the trenches in the property were obscured by thick, impenetrable brush. HRH could not have known the three man crew had duties other than maintenance of the irrigation system or that the system would not work as it was shown on the plans or be maintained as promised. While the purchaser in Spark also complained of brush obstructing his view, the court found that the defects the brush obstructed were of a similar nature to the ones he had already discovered on his own or had been told about by the seller's agent. 234 S.W. at 719.

When one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care.

*Koral Industries, Inc. v. Security–Connecticut Life Ins. Co.*, 802 S.W.2d 650 (1990); *Labbe v. Corbett*, 69 Tex. 503, 6 S.W. 808, 811 (1888).

■ The City also argues that section 27.01 is inapplicable to the fact situation of this case. It contends that the statutory predecessor to section 27.01 was enacted in response to fraudulent oil stock promotions and land sale schemes in the lower Rio Grande Valley which were taking advantage of ordinary citizens. The City maintains that the courts have, and should, view the statute in light of its original intent by examining the effect of the representation on an ordinary mind. It points out that HRH consists of a group of sophisticated and experienced business people, not ordinary citizens. Whatever the legislature's original intent may have been, there is no language in section 27.01 that restricts its operation to ordinary citizens. The Code Construction Act defines "person" to include:

> corporation, organization, government or governmental subdivision or agency, business trust, estate, trust, partnership, association, and any other legal entity.

TEX.GOV'T CODE ANN. § 311.005(2) (Vernon 1988). Obviously, persons who may be defrauded are not restricted to ordinary citizens, but may include business organizations. The City's third cross point is overruled.

### CONTRIBUTORY NEGLIGENCE

Before concluding our discussion of the City's remaining cross points, we will consider HRH's points of error. In response to questions 21 through 23, the jury found that HRH was negligent prior to signing the lease by failing to make a proper inspection of the premises, to test the irrigation water, and to test the soil; that this negligence was the proximate cause of some of its damages; and that HRH could have avoided 49 percent of its damages in the exercise of ordinary care. In its first six points of error HRH complains of the reduction of its damages by 49 percent. HRH argues that contributory negligence is not a defense to actions under section

27.01 or for breach of an implied warranty. It also contends that the court misinterpreted the jury answers to questions 21 through 23 to require the reduction of damages.

■ Texas courts are in agreement that failure to inspect or to investigate will not defeat an action in fraud. The defrauded party is entitled to rely on the fraudulent party's representations. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex.1983); *Wright v. Carpenter*, 579 S.W.2d 575, 580 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Carruth v. Allen*, 368 S.W.2d 672, 679 (Tex.Civ.App.—Austin 1963, no writ). Contributory negligence is not a bar to a claim under section 27.01.

■ We have held that the City may not be sued under the DTPA. While one may recover DTPA damages for breach of express and implied warranties, the DTPA itself creates no warranties; they must be established independently of the Act. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex.1984). Although DTPA damages may not be awarded, the City is still subject to a common law damage award based on breach of warranties.

In *Davidow v. Inwood North Professional Group—Phase I*, 747 S.W.2d 373 (Tex. 1988), the supreme court held that a landlord in a commercial lease impliedly warrants that the premises are suitable for their intended commercial purpose.

> This warranty means that at the inception of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition.

*Id.* at 377. As part of the reasoning on which its holding was based, the supreme court explained that:

> [a] businessman cannot be expected to possess the expertise necessary to adequately inspect and repair the premises, and many commercial tenants lack the financial resources to hire inspectors and repairmen to assure the suitability of the

premises.... Consequently, commercial tenants generally rely on their landlords' greater abilities to inspect and repair the premises.

*Id.* at 376. Clearly then, the implied warranty of suitability covers latent defects in the nature of a physical or structural defect which the landlord has the duty to repair. *Coleman v. Rotana, Inc.,* 778 S.W.2d 867, 871 (Tex.App.—Dallas 1989, writ denied). A tenant, even one who inspects the premises prior to leasing them, is under no obligation to discover each latent defect that would render the premises unsuitable for his purposes at the risk of being found contributorily negligent. Such a doctrine would move us back to the days of *caveat lessee. See Reste Realty Corp. v. Cooper,* 53 N.J. 444, 251 A.2d 268 (1969) (although tenant had inspected premises, there was nothing to show the inspection would have disclosed the flooding problem; lessor knew or should have known of the condition and had a duty to disclose it to the tenant). Thus, contributory negligence will not defeat a cause of action for breach of the implied warranty of suitability.

■ HRH argues that the jury answers to questions 21 through 23 do not warrant the reduction in damages because it is impossible to tell whether the jury concluded that some or all of the three acts of negligence caused 49 percent of its damages. The City maintains that HRH waived this argument by its failure to raise it in its objections to the charge. HRH objected to these jury questions on the grounds that there were no pleadings to support their submission and that there was insufficient evidence and no evidence to support their submission.

A party objecting to a charge must point out *distinctly* the objectionable matter and the grounds of the objection. Any complaint ... is waived unless *specifically* included in the objections. [emphasis added].

TEX.R.APP.P. 274. HRH's objection to the charge did not distinctly or specifically point out the complaint it now asserts; it is waived. *Davis v. Campbell,* 572 S.W.2d 660, 663 (Tex.1978).

## LOST PROFITS

■ A tenant may recover profits lost as a proximate result of an actionable wrong that interferes with its business. *Beam v. Voss,* 568 S.W.2d 413, 419 (Tex. Civ.App.—San Antonio 1978, no writ) (interference with tenancy); *Harper Building Sys. v. Upjohn Co.,* 564 S.W.2d 123, 127 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.) (breach of warranty); *Birge v. Toppers Menswear, Inc.,* 473 S.W.2d 79, 85 (Tex.Civ.App.—Dallas 1971, writ ref'd n.r.e.) (breach of lease). The City argues in its fifth cross point that the court should not have submitted the jury question regarding lost profits because the profits claimed were too uncertain and speculative and because the business was new and unestablished. Lost profits will not be denied merely because a business is new if factual data is available to furnish a sound basis for computation of probable losses. *Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348 (1955). It is not necessary that profits be susceptible to exact calculation; it is sufficient that there is evidence from which they can be determined with a reasonable degree of certainty. *Memorial City Gen. Hosp. Corp. v. Cintas Corp., No. 81,* 679 S.W.2d 133, 137 (Tex.App.—Houston [14th Dist.] 1984, no writ). "Profits" are net pecuniary gain from a transaction; gross pecuniary gains less the cost of obtaining them. *Vicki Indus., Inc. v. Hupp Sys., Inc.,* 521 S.W.2d 733, 736 (Tex. Civ.App.—Waco 1975, no writ). Recovery of lost profits is allowed where a business is established on the strength of a contract but is discontinued because of its breach. *Pace Corp.,* 284 S.W.2d at 348.

HRH had operated under the lease for approximately three years. Dale Hardin testified that the total expenditures by HRH on the project to the time of trial had been $360,509.15. These expenses included such items as the cost of the lease, labor costs, equipment leases and purchases, fuel and oil, utilities, taxes, legal fees, insurance and the cost of the plants themselves. It also included $82,691.62 in interest paid or payable as of the date of trial on a bank loan taken out by HRH to fund its busi-

ness. The sales prices of HRH's products were well-established, and there was testimony that there was a market demand in Texas for those products. The trees of the type grown were selling for $35.00 to $50.00 each. Using the $35.00 figure, Hardin projected his net profit on trees and shrubs over the life of the lease to be $1,297,000.00. His projected net profit for St. Augustine grass over the life of the lease was $239,000.00. James Harden, a nurseryman of 25 years experience, testified to the reasonableness of the figures for the trees and shrubs. The jury awarded HRH only $25,000.00 in lost profits, perhaps taking into account the speculative nature of the future profits. James Harden testified that the 13,000 trees that had been planted needed another year to reach a value of $35.00 to $50.00 each. Another expert testified that they could be sold in their current state for $5.00 to $10.00 each. Using a figure of approximately $30.00 per tree, the jury could have concluded that HRH could have made a $25,000.00 profit just on the trees that had been planted. We think the evidence is sufficient to support the jury's award.

### INTEREST

■ In a three-part question, the jury was asked to enumerate HRH's damages, if any. It answered HRH was entitled to $246,167.53 in out-of-pocket expenses not including interest, $25,000.00 in lost profits, and zero dollars in interest. It also answered that HRH should be awarded 40 percent of its recovery as attorney's fees. HRH complains that the trial court should have awarded it $82,691.62 representing interest on the bank loan and 40 percent of that amount as attorneys fees. The court denied HRH's motion to disregard the jury's answer of zero. The City argues that the interest damages are not a question of law, but a question of fact for the jury.

We are not speaking here of interest as damages, but of interest as interest, that is, as compensation allowed by law or fixed by the parties for the use or detention of money. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex.1985).

Interest due on a loan taken out for the purpose of conducting a business is a cost of doing business just as are payments for labor, equipment, and utilities. The City was aware that HRH planned to conduct a wholesale nursery business at the farm. While it may not have been aware of HRH's financing arrangements, it may reasonably be assumed that the City contemplated that the business would need to be financed, whether by HRH's own funds or by a loan from another source, and if by a loan, that interest would be a cost of the loan. Given the unchallenged proof of the existence of the loan and of the amount of interest due, there was no basis for the jury's answer of "zero" to the interest question. The court should have granted HRH's motion to disregard the answer. HRH should have been awarded an additional $82,691.62 plus 40 percent of that amount, or $33,076.65 as attorneys fees.

### ATTORNEYS FEES

■ The City challenges the basis for the entire attorneys fee award in its sixth cross point contending that HRH failed to establish that the 40 percent fee was reasonable, necessary, or bore any relationship to the amount of work expended. It objected to the submission of the attorney fees question on these grounds.

A person who violates the provisions of section 27.01 is liable to the person defrauded for "reasonable and necessary" attorneys fees. TEX.BUS. & COM.CODE ANN. § 27.01(e) (Vernon 1987). Except where reasonableness may be presumed, which it cannot be here, their reasonableness is a fact question and must be supported by competent evidence. *Smith v. Smith*, 757 S.W.2d 422, 424 (Tex.App.— Dallas 1988, writ denied).

Contingent fees have routinely been upheld in cases brought under a statute allowing recovery of attorneys fees. *March v. Thiery*, 729 S.W.2d 889, 897 (Tex.App.— Corpus Christi 1987, no writ) (DTPA); *Hochheim Prairie Farm Mutual Ass'n v. Burnett*, 698 S.W.2d 271, 278 (Tex.App.— Fort Worth 1985, no writ) (former attor-

neys fees statute); *Liberty Mut. Ins. Co. v. Allen,* 669 S.W.2d 750, 755 (Tex.App.— Houston [1st Dist.] 1983, writ ref'd n.r.e.) (workers' compensation statute). Testimony that the particular percentage is the normal, customary or reasonable fee for the particular case is sufficient to support contingent fee awards. *March,* 729 S.W.2d at 897; *Hochheim Prairie,* 698 S.W.2d at 278; *Texas Farmers Ins. Co. v. Hernandez,* 649 S.W.2d 121, 125 (Tex.App.—Amarillo 1983, writ ref'd n.r.e.). HRH's attorney agreed to represent it for a 40 percent contingent fee because the business had no funds. They entered into a contingent fee contract which the attorney testified was "a very customary and usual fee arrangement for this kind of situation." The attorney testified that it was a complicated case and that he had spent "something under 200 hours" on the case preceding trial. The trial itself took a week. No evidence was offered to refute the testimony that the fee was customary and usual. We view the testimony as sufficient to support the award.

## AGREEMENT TO REPAIR

The City's remaining cross points are premised on an alleged agreement to repair defects in the irrigation system. The City argues that the court erred in disregarding the answer to question 27. By that answer the jury found the parties agreed that when problems with the irrigation system arose, they would be corrected by HRH supplying the labor and the City supplying the materials.

■ The City argues that the agreement constituted a compromise and settlement and an accord and satisfaction that bars HRH's claims. The two are closely analogous. A compromise and settlement is the conclusion of a disputed or unliquidated claim through a contract in which the parties agree to mutual concessions in order to avoid resolving their controversy through litigation. *Priem v. Shires,* 697 S.W.2d 860, 863 n. 3 (Tex.App.—Austin 1985, no writ); *Alexander v. Handley,* 123 S.W.2d 379, 381 (Tex.Civ.App.—Dallas 1938) *aff'd,* 136 Tex. 110, 146 S.W.2d 740

(1941). The accord and satisfaction defense rests upon a new contract, express or implied, in which the parties agree to the discharge of an existing obligation in a manner otherwise than originally agreed. *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex. 1979). The essential difference between a compromise and settlement and an accord and satisfaction is that the former must be based on a disputed or unliquidated claim while the latter may be based on either a disputed or undisputed claim. *Priem,* 697 S.W.2d at 863 n. 3. Either may work a novation which is the discharge and resulting bar of an old obligation by a contract that substitutes a new and inconsistent obligation with the intention to extinguish and bar the old obligation. *Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 424 (1953); *Priem,* 697 S.W.2d at 863 n. 3.

■ The City argues that HRH should have sued on the lease as modified by the repair agreement, rather than on the original lease. It relies on *Priem,* but that reliance is misplaced. In *Priem* the parties expressly acknowledged that they intended by their agreement to compromise and settle disputed claims. *Id.* at 864. The court also held that the agreement was one of accord and satisfaction and that it constituted a novation. *Id.* Because the parties intended a novation, they could only sue for breach of the contract of accord and satisfaction rather than the original extinguished contract. *Id.* at 865. In the instant case, there was no novation, that is, no extinguishment of the original lease and substitution for it by the repair agreement. The agreement addressed the question of repair of the irrigation system because the lease was silent on that subject. The lease was left otherwise intact and enforceable. It was thus proper, indeed necessary, to sue for the enforcement of the original lease.

■ The City also argues that the agreement constitutes a modification of the lease. HRH contends that the alleged modification is invalid as a matter of law because it was required to be in writing. A lease of real estate for a term of more than

one year must be in writing and must be signed by the person to be charged. TEX. BUS. & COM.CODE ANN. § 26.01(b)(5) (Vernon 1987); TEX.PROP.CODE ANN. § 5.021 (Vernon 1984). Generally, a modification of a lease required to be in writing must also be in writing. *Lone Star Steel Co. v. Reeder,* 407 S.W.2d 28, 31 (Tex.Civ. App.—Texarkana 1966, writ ref'd n.r.e.). There are, however, exceptions to the general rule. If the oral modification is not *material,* that is, if the character or value of the underlying agreement is unaltered, the modification is enforceable. *Garcia v. Karam,* 154 Tex. 240, 276 S.W.2d 255, 257 (1955); *Group Hosp. Services, Inc. v. One and Two Brookriver Center,* 704 S.W.2d 886, 890 (Tex.App.—Dallas 1986, no writ). In *Group Hosp. Services* the modification did not alter the primary obligations of the lease; the tenant remained in possession and the dispute ran only to a comparatively small segment of its obligation to pay. The modification merely filled in details concerning which the lease was silent. 704 S.W.2d at 889–90. In the present case, as we have said, the agreement merely "filled in the blanks" of the lease. It was silent regarding the obligation to repair the irrigation system. The parties worked out a mutually satisfactory agreement that HRH would do the repair work and the City would pay the costs of parts and materials. HRH's possession was not disturbed and it continued to pay rent and conduct its business as best it could, given the condition of the irrigation system. Further, the modification was executed by HRH. It made the repairs in accordance with the agreement, remained on the leasehold and paid its rent. It cannot now raise the Statute of Frauds as a defense. *McCreless Shopping Village, Inc. v. Burton,* 352 S.W.2d 802, 803 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.).

The question remains whether the modification defeats HRH's claims. The City maintains the parties, by their agreement, solved the problems with the irrigation system in the seven acre tree farm and the 20 acre St. Augustine field. Because HRH's claims pertain only to defects in the irrigation system, because the defects were corrected in those two areas, and because HRH only planted there, the City concludes that the problems HRH complains of were solved.

*Davidow* makes clear that the parties may supersede the implied warranty of suitability with an express agreement that the tenant will repair certain defects. 747 S.W.2d at 377. If the modification affected the amount of HRH's out-of-pocket expenses, it was up to the City to show by how much. The City never offered such proof, nor did it challenge the out-of-pocket figure provided by Hardin or found by the jury.

It is not the case that all HRH's problems were solved by the rehabilitation of the seven acre tree farm and the 20 acre grass field. The St. Augustine field was rehabilitated and grass planted before the problem with the automatic valves became apparent. When the valves would not shut off, the field was ruined and the valves were replaced with mechanical valves too late to save the field. The problems with the irrigation system in the remaining acreage of the farm and the parties' inability to agree on how they were to be remedied prevented HRH from properly conducting its business.

## CONCLUSION

HRH's points of error are sustained. The City's fourth cross point is sustained and the remaining are overruled. The judgment is modified as follows: HRH is awarded $271,167.53, representing out-of-pocket expenses and lost profits as found by the jury, plus $82,691.62, representing interest on its bank loan, for a total of $353,859.15. In addition, HRH is awarded 40 percent of that amount, or $141,543.66, for attorneys fees. The total amount due HRH from the City of Kerrville is $495,402.81. As modified, the judgment is affirmed.